Jim (a slave) *vs*. The State.

No. 80.—Jim, (a slave) plaintiff in error, *vs*. The State of Georgia.

[1.] When, upon application for a continuance by a prisoner, on account of excitement and prejudice in the public mind, the same is refused, and the prisoner tried and convicted; and it appears from the record that he was clearly and conclusively guilty, and that if delay had been granted, no testimony could have been produced, sufficient to change the result, this Court will not disturb the judgment in the Court below.

[2.] It is no good objection to the confessions of a slave, made to a free white citizen, that such slave was, as a slave, compelled to answer any question a white man might put to him.

[3.] Voluntary confessions, made by a prisoner after he is tied, may be properly admitted in evidence.

[4.] The homicide of his master, overseer, or lawful employer, by a slave, in resistance to an assault made upon him, must be either justifiable homicide or murder.

[5.] Where a motion for a new trial was submitted, on the ground that one of the Jurors who had tried the prisoner, had formed and expressed an opinion, unfavorable to him, before trial; and that this was not known until afterwards; and where the Juror, in his vindication, stated that the opinion expressed had been founded upon report, and was such that would yield to the evidence upon oath, and not such, as by prejudicing his mind, would prevent him from finding a verdict according to the evidence: *Held*, that the Court did not err in deciding that the Juror was competent, and in refusing a new trial.

Jim (a slave) *vs.* The State.

Indictment for murder, in Lee Superior Court. Tried before Judge PERKINS, June Term, 1854.

Jim, (a slave) stood indicted for the murder of a white man, his overseer. A motion was made for a continuance, on the ground that the excitement and prejudice in the public mind was so great that he could not go safely to trial; this being the first term of the indictment, and the alleged offence being committed in January, 1854. This motion was supported by the statement of counsel in their place, and the testimony of four disinterested citizens of the county. The Court refused the motion, and counsel for defendant excepted.

The State offered in evidence, the confessions made by the negro to a white man, shortly after the act, to which counsel objected, on the ground that they were not voluntary—a slave being bound to answer all questions put to him by a white man. The Court over-ruled the objection, and counsel for defendant excepted.

It appearing that the prisoner was secured and tied, by the order of the overseer, at the time the confessions were made, counsel renewed the objection, that they were made under duress. The Court over-ruled the objection, and counsel for defendant excepted.

The confessions were, that the deceased, a youth weighing about 100 lbs. raised a maul and attempted to strike the prisoner, a stout man; that the prisoner then knocked him with an axe, and struck him more than once; said that deceased ran from him, and begged him to desist, but that he would not, because he was mad.

Counsel for defendant requested the Court to charge, "that if a negro was attacked by his overseer, or any other person, with a weapon calculated to produce death, and the slave, under an apprehension for his life, or that a felony is about to be committed upon him, in his own defence, kills his assailant, he is justifiable". The Court charged as requested, with this qualification—"that the slave would not be justifiable, if there was any other way to save his life, or escape the threatened

Jim (a slave) *vs.* The State.

violence of the overseer". To this qualification, counsel for defendant excepted.

Counsel farther requested the Court to charge, "that if a master or overseer, inflicts unmerciful and unreasonable punishment upon a slave, such as would amount to a crime, under our Penal Code, and the slave, in a moment of passion, consequent upon the punishment, kills him, it is manslaughter and not murder". The Court refused so to charge, and counsel excepted.

A motion was made for a new trial, on the ground that one of the Jurors, John H. Pope, had formed and expressed an opinion, (before being sworn as a Juror,) that prisoner ought to be hung. This motion was supported by the affidavit of two witnesses, who proved the expression of the opinion, the morning of the day of trial. The Juror exculpated himself by affidavit, that this opinion had no influence, whatever, over him, and did not bias his mind, in any manner whatever. *Seven* other Jurors swore, that Pope, in no wise, controlled or influenced the balance of the Jury; but that every Juror, on retiring, was fully satisfied of the guilt of prisoner.

The Court refused a new trial, and counsel excepted.

On these exceptions error has been assigned.

MORGAN, and B. HILL, for plaintiff in error.

LYON, Sol. Gen. and HAWKINS, for defendant.

*By the Court.*—STARNES J., delivering the opinion.

[1.] The first point presented for our consideration, arises out of the motion to continue, because of the excitement and prejudice, in the public mind, against the prisoner. The crime was charged to have been committed in January, 1854, and the case came on for trial at the July Term ensuing, of the Superior Court in Lee county. The prisoner had been confined in jail, and had not had the assistance of any one, in preparing himself for trial; and as his master had failed to give

him any assistance for this purpose, it was insisted, that whatever might be the strength of his case, it was very hazardous for him to go to trial, whilst the public feeling was so strongly against him.

These circumstances presented strong claims to the favorable consideration of the Court; and they would, undoubtedly, have entitled the prisoner to a continuance, if that continuance could have profited him anything. But neither the statements of counsel, nor the affidavits which were furnished, show that any material testimony could have been procured, which was not before the Jury, or that a different case could, in anywise, have been made out for him, if the cause had been continued, or if he had had the advice of counsel before the session of Court. It is, indeed, impossible for us to see, from the record, how any evidence could have shown the killing to have been different from what the prisoner, in his confessions, stated it. And putting the most favorable construction upon the testimony, thus voluntarily furnished by him, the act committed was murder.

The only other testimony, which it was pretended in the argument, might have been procured, was the possible statements of a witness, in conflict with the evidence of the woman, Silla, as to previous threats. But it is our opinion, that if this latter evidence be put out of the question, still, enough appears, from the prisoner's admissions, and other uncontradicted evidence, to prove him guilty of murder. Taking his own statements as true, that the deceased threatened to strike him with a maul, and putting out of view all previous threats, how stands the case? The deceased, as his master's agent, and his overseer, was, for the time, and for the purposes of his work, his master. He should not have fought with the deceased, as he confesses he did. It was in his power to have avoided this. The testimony shows that the deceased was "a slender youth", weighing not more than about one hundred pounds, whom, according to Mr. Forrester, the prisoner "could have tied and whipped, as easily as he (the witness) could one of his children". When the deadly blows were inflicted, he could not have been in danger of injury from the maul; for, his own state-

ments show, that the deceased begged him to desist—that he ran from him—and that the prisoner struck him more than one blow ; and other evidence, uncontroverted, shows that he must have pursued the deceased, and dealt him the mortal blows with his axe, on the back of the head, as the poor boy ran from him, or after he had fallen on his face. There was no sign of the prisoner having received a blow; and he confesses that he did not desist, not because the deceased was menacing him, but " because he was mad".

The evidence thus shows, that though the prisoner had been threatened by the deceased, in the way he stated, yet, that there was no' necessity for him to have taken the life of the deceased, even to save himself from the slighest bodily harm. And though he had never previously meditated an injury to the deceased, and was provoked into passion by him, yet, that in that passion, without reasonable cause or provocation, with an instrument calculated to produce death, and with brutal malignity he had pursued and taken the life of the deceased. From the circumstances of such a homicide, the law implies malice, and the prisoner was, therefore, guilty of murder, whatever may have been the threat which the deceased made with the maul, and whether or not the prisoner had ever uttered the previous threats attributed to him.

In view of such facts, which the circumstances showed could not be materially varied, a continuance, of course, would have been fruitless.

Speaking for myself, alone, I confess that I was strongly stimulated to the desire to grant the prisoner a continuance, (and would certainly have favored it, if I could have ascertained that, by possibility, it would have availed him anything,) by the consideration, that his master had failed or refused to give him assistance. It is true, that, in our State, no man, white or black, bond or free, can be tried without the assistance of counsel, as the humane provisions of our law require the appointment of counsel by the Court, for every one accused with crime, who is unable to procure counsel for himself; and in this way, this prisoner found able and zealous assistance at

Court. But my idea of the master's duty, in such a case is, that he should, if able, (and it appears that ability was not wanting in this case,) see to it, that his slave has the benefit of counsel, and counsel's advice, when he is accused with such a crime, and this at the earliest convenient moment of his need, in order, that if innocent, he may have every opportunity of proving it ; if guilty, he may have his right of being proven so according to law. And it is my opinion, that this duty of procuring counsel for his slave, under such circumstances, is in return for the profits of the bondman's labor and toil, is as binding on the master, as the obligation to procure for that slave, medical attendance in his sickness, or food and clothing at all times. And I do think, that the conduct of the master who shrinks from this duty, whatever may be *his* opinion of the slave's guilt, or whatever the public excitement against him, is highly reprehensible.

[2.] The next objection was, that the testimony of the witness, Forrester, as to the confessions of the prisoner, made to him at the gin-house, should not have been received, because the prisoner " was a slave, and compelled to answer any question said Forrester, as a white man, might put to him".

We cannot recognize the correctness of this new proposition. It may be true, that it is proper for a slave, always to answer, respectfully, the questions of a white man ; but if this be so, it does not follow, that where no improper effort is made to extort confessions from him, he is obliged to make confessions to any white man who questions him. We see no sufficient reason, therefore, for the rule which the Court was asked to recognize ; but do see that its operation would lead to very troublesome and injurious consequences; even if it be coupled with the idea (which appears in the bill of exceptions, though not in the assignment of errors) that Mr. Forrester had authority over this slave, and he was obliged to answer him, as he would have been bound to answer his master.

We are not prepard to admit that this would have made any difference, if it had been so ; but it is useless to enter into this discussion, as nothing is to be found, in the evidence, which goes

to show, that Mr. Forrester, at the time of his arrest, was in authority over the slave—as representing his master in any way.

[3.] It was also urged, that the admissions of the prisoner, after he had been arrested by Mr. Forrester, and at his instance tied, should have been repelled, as given under duress.

The simple and well-established rule which prevails on this subject is, that the confessions of a prisoner are not to be excluded, because made whilst he was in bonds, if they were voluntary. If not drawn forth by some promise that it should be better for him, [if he confessed; or threat, that it would be worse for him, if he did not confess, his admissions are good evidence.

The evidence in this case shows, that these confessions were not extracted by promises or threats, of any description.

[4.] The next point made, is a very important one, and devolves upon us, to some extent, a consideration of the true *status* of the slave in our State.

The legal principles which we shall deem it necessary to assert, and some of the sentiments which we may think it expedient to utter, in this connection, may shock those who are prejudiced against the institution of slavery—who are unmindful of the causes and the means which influenced, and the men who established that institution in our country—who are blind to the difficulties in dealing with the subject, on the part of those whose interests are involved in it, and *their right* to deal with it for themselves, according to their consciences, and in view of the solemn responsibilities under which they rest to their Maker. But we will not shrink from our duty, nevertheless, sincerely convinced, as we are, that it is of more importance to the best interests of the master and slave, where this relation exists, that justice should be administered on the principles we lay down, than that a diseased sensibility should be propitiated.

The charge which was asked of, and which was refused by the Court below, involved the question, whether or not, when a slave is attacked by his overseer, or any other person, with a

weapon calculated to produce death, under the apprehension of danger to his life, or that a felony is about to be committed upon him, he may kill his assailant? And also, whether or not, if a master or overseer inflicts unmerciful or unreasonable punishment upon his slave, such as would amount to a crime under our Penal Code, and the slave, in a moment of passion, consequent upon the punishment, kills him, it is manslaughter?

The evidence, in this case, only authorizes a consideration of these questions, as they apply to the master or his agent, and not to other persons; for the killing, here, was of the overseer. We shall not go out of the record, therefore, to consider any other matter.

 By the Common Law of our State, implicit obedience is due from the slave to his master, or to his master's agent—an overseer. Policy and humanity, both, demand this law of submission in the slave. Where the relation of master and slave exists, obedience in the latter to the former, is absolutely necessary to the maintenance of that subordination, on which depends, not only the comfort of both master and slave, but on which rests the very existence of the institution itself, as part and parcel of the body-politic.

Whatever may be thought of the morality of slavery—of the responsibilities of those who established, or those who continue it—of how it shall be dealt with, and what shall be its destiny, this is not the place or the occasion for such discussion. We find it, as a part of that system of laws, in the order of God's Providence, established by our fore-fathers, which it is our duty to administer; and we are convinced, that every reasonable man must see, with us, that whilst it does exist, due subordination, on the part of the slave, is a primary necessity, to both bond and free—more of a necessity, than is subordination, in the family circle, to the head of the household. Such subordination can only be maintained by the right to give moderate correction—a right similar to that which exists in the father over his children.

And here, we remark, that the master has no other right in our State. Our Constitution and Laws provide, that if he

Jim (a slave) *vs.* The State.

murder or maim his slave, he shall be punished, as he would be punished, if he committed murder or mayhem upon a free white citizen—even his child.    Our laws punish him for unnecessary or excessive whipping; or for cruel treatment of his slave, in any manner, by which his health is impaired; and public opinion sustains these laws.

The law, thus, does what it can, to guard against immoderate chastisement.    But, up to the point of endangering the life of the slave, it must necessarily leave to the master, and not to the slave, the right of judging, as to the nature and degree of that chastisement, subject to his responsibilities to the Penal Law.    If the master exceed the bounds of reason and moderation, in his chastisement, the slave must submit, as the child submits to the correction of its parent, and trust to the law for his vindication.    He cannot, himself, undertake to redress his wrong, unless the attack upon him be with an instrument, or in the use of means calculated to produce death.    In such event, he being in the peace of God and of the State, and not able, otherwise, to avoid or escape the assault, if he kill his assailant, he is justified; and in such event only.    The law so making that allowance for his fear of death, which it refuses to make to his passion.

We should reflect, that where allowance is made for that heat of blood which reduces an offence from murder to manslaughter, still the act is held to be a *crime.*

In consideration, that by reason of human infirmity—that is, of man's evil passions, he is prone to do that in anger, which he would not do in cooler moments, the law makes allowance for his conduct, when, under such circumstances, he deprives his fellow-man of life, and lessens the degree of his guilt.    But, in the sight of his Maker, he has no more right, in passion, to deprive his fellow-man of life, than he has to do this with deliberate malice.    If, in framing human laws, then, it was found to be not wise and expedient that this indulgence should be extended, in consideration of human infirmity, it would surely be morally right, that it should be withheld.    Just so it is, that our laws refuse this indulgence to the passion of the

slave, to his sense of provocation, and command him to re-strain it, when he is chastised by his master; because, to al-low it, would be to make him the judge, (and to suffer him to act upon his judgment,) as to the reasonableness or unreasona-bleness of the extent and degree of that patriarchal discipline which the master is permitted to exercise—would be to place him continually in a state of insubordination, and to encourage servile insurrection and bloodshed. Our law thus wisely les-sens the privileges of the comparatively few, for the greatest good of the whole.

It results, as a consequence, that the homicide of his mas-ter, overseer, or employer, (representing the master, as his agent,) by a slave, in resistance to an assault made upon him by that master, overseer, or employer, must, in all cases, be either justifiable homicide or murder.

[5.] The motion for a new trial, on the ground that John H. Pope was an incompetent Juror, was properly over-ruled.

This Court has repeatedly decided, that when, after a ver-dict, a motion for a new trial is made, on the ground that one or more of the Jurors had formed and expressed an opinion, before the trial, which was not known to the prisoner until af-terwards, the Juror may be heard in his vindication; that the Court will, as it were, place itself, as nearly as possible, in the position which triors occupy, when a Juror is ordinarily put upon trial; and if, upon hearing the explanation of the Juror, and any testimony he may present by affidavits, the Court is convinced that the Juror was misunderstood or misrepresented, or is otherwise satisfied that he was a competent Juror, the verdict should not be disturbed. And especially when, as in this case, he was not put upon his *voir dire*, and no questions were asked him. See the reasons assigned, more at large, for this practice, in the case of *Anderson vs. The State*, (14 *Ga. R.* 709.)

The explanation in this case, given by the Juror, should be deemed satisfactory. He states, that the opinion which he had expressed, was from report, but that it was such an one as was subject to be changed by the facts of the case, when they

should be stated by witnesses, on oath; and that his mind was not prejudiced by what he had heard against the prisoner. If this were so, it was a light, and not a deep-seated impression, and did not disqualify him as a Juror.

The affidavit of his fellow-Jurors also shows, that his demeanor in the Jury-room, was that of a fair and impartial Juror.

Let the judgment be affirmed.