## WESTBROOK *v.* THE STATE.

1. A warden in charge of convicts working on a county chain-gang has no authority to administer corporal punishment to a convict, except such as may be reasonably necessary to compel the convict to work or labor in the execution of his sentence or to maintain proper discipline.
2. Corporal punishment of a convict by a warden, administered where the circumstances are not of a character sufficient to authorize such punishment, is an assault.
3. Where a warden attempts to administer corporal punishment to a convict under circumstances where the attempt amounts to an assault, and calls upon another convict to assist in administering the punishment, and the latter (in rendering such assistance) exercises some force against the convict sought to be punished, tending to overcome him and put him in the power of the warden, it is for the jury to say with what intent the force was exercised and whether such other convict is an abettor of the warden.
4. If, under the circumstances enumerated in the preceding headnote, the assaulted convict, while engaged in a fight with the warden to prevent the assault, turned and slew the fellow-convict who was an abettor to the warden in committing the assault, the homicide might be reduced to voluntary manslaughter; and it was erroneous for the judge to omit to charge the law relating to that offense.

Argued October 18,—Decided December 22, 1909.

Indictment for murder. Before Judge Mitchell. Tift superior court. July 29, 1909.

Cleveland Westbrook was convicted of murder, without recommendation. His motion for new trial was overruled, and he excepted. In the motion it was contended that the evidence was of such character as to reduce the homicide to voluntary manslaughter, and complaint was made that the judge failed to charge the jury the law applicable to that offense. The defendant was a convict working on the chain-gang in Tift county. It does not appear whether he was a felony or a misdemeanor convict. J. M. Davis, a witness for the State, testified that he was warden at the county convict camp on January 22d, when the defendant killed another

convict on the "squad chain" with him. There were 10 or 12 con-
victs on the same chain. The defendant was on the end of the
chain and the deceased was next to him. Witness and a guard by
the name of Walker were the only white men there. He also testi-
fied: Every night, in order to keep the cars clean and give them
more room, I had a shed built on the outside—just run out with
tin; and I would let them build a fire on the outside so they could
warm out there; we had no heat in the car. It was very dark and
foggy, but we would let them sit out there until time to come in the
car; then we would lock them up. I was right close by. I let them
sit out there and smoke and talk. A few minutes before the fight,
I was in the car there, and heard a disturbance. I suppose I was
twenty steps from them. I holloaed to them and asked them what
the trouble was. One said, "Blindy is cutting up" (they called
him Blindy—blind in one eye). They said, "You will have to
come out here." I got up and went out there, and one of the boys
met me and said, "You had better watch him; he has got a knife."
I went out there and asked him what the trouble was. I saw he
had gotten off to himself; all the rest of the boys were standing off
from him; he was on the bench whittling with the knife. I said
"What are you doing with that knife?" He said "I just got it."
I said, "What is the trouble?" He said "These boys are trying to
run over me." I said "I think you are mistaken; I heard it; you
started it." He said "No, sir, these boys are running over me."
I said, "You have been cutting up some little bit, and I will have to
correct you. I told you about it several times." The witness, re-
peating the substance of the foregoing colloquy, testified as fol-
lows: "I went out there and told Cleveland that I would have to
punish him for his conduct. He says, 'No, sir, you won't.' I says,
'I reckon I will; you are not running this business.' He says, 'I
know that, but you aint going to whip me.' I said, 'I reckon I
will; throw that knife out here.' He said, 'No, sir, I am not going
to give this knife to nobody.'" The witness further testified: "I
knew it would not do to leave him there with that knife. I tried
to get the knife away from Cleveland with every means I could. I
called one of the trusties, Eugene Wilson, a big negro I had there.
He started up to him, and he drew the knife on him, and he got
back. The boys began to get scared and pulled away, and this
chain tightened up on Cleveland, and Cleveland starts to stick the

knife in this boy next to him. He started, and I raised the strap; I said 'Stop, I will hit you—don't cut that boy.' Then he held the knife back in shape to stab at me. They kept tightening the chain, and he started at him again, and I struck him in the face to stop him. He turned at me and was cutting at me, and I kept striking him in the face to stop him. He couldn't get to me, the chain stopped him. The boys got scared and kept tightening the chain. He just wheeled and took into the crowd and the first boy he came to was this James Davis. He struck him in the breast the first lick, and he was still trying to get to me. When he stabbed him the first time he fell, and he turned back [to] give two or three more licks at me. In that time this boy was on his all-fours, and he just stabbed him in the back. If they hadn't gone back the chain wouldn't have tightened on Cleveland." On cross-examination the witness testified: "It was about half-past eight at night, good dark. I was in my car and could not see the boys when the disturbance arose between them. They had been playing a good deal. The first thing that attracted my attention was, I heard one of the boys say, 'You can't handle Big Boy' (Eugene Wilson, the trusty). Nobody called me, but I heard the angry voices, and asked what the trouble was. I don't know how they had been playing, but think they had been rapjacking one another with leather belts. Don't know whether the defendant had one or not, and don't know whether they had all been rapjacking him or not. When I got there the defendant was not fighting, was sitting down quiet, with the knife between his legs. The others were standing around quiet. I didn't know what he had been doing before I went out there—I hadn't seen them. . . I knew there had been a fuss—I knew he had been quarreling. I didn't know what caused the quarreling, and didn't know whether Cleveland was in the right or wrong until after I got out there. I had no commission from the State. The camp was under the charge of the county commissioners. When I went out there I had my strap in my hand. When I told him to get ready for the whipping he had the knife in his hand. He stepped out and pulled off his coat and laid it on the bench, and stepped back a step or two and looked at the chain and looked at me and said 'I don't think you ought to whip me.' I said to him 'Throw the knife out here and get down across the bench.' He dropped his head and thought a minute and said,

'No, sir, you or no other man don't whip me.' The boys began tightening the chain—they saw there was going to be trouble; they were trying to get away. I called on Mr. Davis, the trusty, and the boys on the chain, to assist in getting the knife away from him. He just made a spring at that boy, the first one on the chain next to him; after he cut at him he rushed on over at me; when he stabbed to hit the boy I struck him in the face with my strap, and he made at me. He hadn't attempted to strike me before that. He told them to stand back or he would kill the first one that came at him. The boys on the chain pulled back and pulled him along. At that time he made the spring at the boy nearest to him. Then I struck him in the face, and he turned on me. I hit him some eight or ten times; then he turned and stabbed the boy, and then turned back on me. I hit him over the head; they kept tightening the chain. Then he turned and stabbed the boy again. I never heard any fuss between the defendant and the deceased. Don't know that they ever had a cross word." George Walker, the only other witness for the State, testified: "Ten or twelve of the boys were on a chain, all sitting around the fire, having a good time, like negroes usually do, singing and going on, cutting up. My cousin Jack had been there that night, and I went forty or fifty steps with him when he started home, and then I went back to the camp. Before I got there I heard some of the negroes disputing. I walked out there and said, 'What is the matter?' Big Boy said nothing, and I turned and walked back to the car and got in the car, and about that time Mr. Davis got out and went out there. I heard them talking, heard Mr. Davis ask them, 'What's the matter?' heard the fuss and about that time I started, and about that time Mr. Davis called me. When I got there it seemed that Cleveland was fixing to fight some of them. Mr. Davis was telling him that he had let him off time and time again, and he would have to whip him. He says, 'Not to-night. I ain't going to take no whipping to-night.' He says, 'I guess you will.' He said, 'I will die before I will take a whipping to-night.' He had his knife, and Mr. Davis said, 'Boys take him down.' He insisted on the boys coming and helping him take it away. I said, 'Don't run up on him, I will fix him.' I sent Gus, a negro, to get a rope to lasso him. Mr. Davis got up pretty close and he stabbed at him, and he struck him in the face with the strap. And it was lick for lick four or five times there—they kept

all the slack out of the chain.   I picked up the chain and was getting the slack out of it, and about the time it tightened on him he turned and stabbed James Davis.   Then he stabbed him again in the back.   Then I run and got a fence rail and shoved him down and let the rail fall on his head, and the boys covered him, and one of the convicts grabbed his hand and wrung the knife blade out of the handle with his other hand.   I got out there before any licks were struck.   I wasn't over fifteen seconds, hardly, from getting there when Mr. Davis did.   The negro was cutting at Mr. Davis when Mr. Davis hit him the first lick in the face—lick for lick. If Cleveland cut at another convict before he cut at Mr. Davis, or before Mr. Davis hit him in the face, I did not see him.   I saw the first lick struck.   The fight started right quick after I got there."

*Robley D. Smith* and *R. E. Dinsmore*, for plaintiff in error.

*John C. Hart, attorney-general*, and *William E. Thomas. solicitor-general*, contra.

ATKINSON, J.   The Penal Code of 1895 contains the following: "§1147.   No whipping shall be administered to a convict by a whipping-boss or other officer or person, except in cases where it is reasonably necessary to enforce discipline or compel work or labor by the convict."   Other statutes relating to the government and treatment of convicts are: Penal Code, §§1146, 1148, 1149, 1170, 1171; Acts 1897, p. 72, sec. 6; Acts 1903, pp. 67-8, sec. 2; Acts 1908, pp. 1124-26, secs. 10-13.   There are no statutes which tend to change any provision of any of these, as to the policy of the State, or power of those in charge of convicts to inflict corporal punishment.   There could be no rule of the Prison Commission, or other administrative body in charge of convicts, enlarging the power referred to, because the provisions of the Penal Code, §1147, expressly prohibit corporal punishment unless it is reasonably necessary to enforce discipline or compel labor.   As to whether an officer charged with the duty of enforcing discipline or compelling work has authority to administer corporal punishment to convicts is a question which depends upon the facts of each case, and is to be determined by the test of reasonableness.   It is the duty of the convict to submit to every command which the warden or other officer has authority to require, but not to any which the warden or other officer has not authority to require.   If the warden exceeds his authority by inflicting corporal punishment without cause, his

act done ultra vires would amount to an assault, and would be indefensible in law.  In this connection see cases cited in 9 Cyclopedia of Law and Procedure, 877, C.  If this were not true it would be in the power of the warden, or other similar officer, to subject a convict to physical torture though he had violated no duty as a convict by any act of omission or commission.  The trend of the statutes above cited tends to the humane rather than the cruel treatment of convicts.  Upon conviction the convict may lose his liberty for the time being, and may be required to perform hard labor, but he does not lose security of his person against unlawful invasion.  The security of person, except as expressly provided by statute, remains his right; and if it be unlawfully invaded, he may resist such unlawful invasion as if there had been no conviction.  If the warden, or other officer, inflicts corporal punishment under circumstances which the law does not recognize as sufficient to justify, he invades the convict's right of personal security, and does so at his own peril.  As the officer can never exceed the bounds of reason in determining what circumstances will justify corporal punishment, it is generally a question of fact for determination by the jury whether there is reason and authority for administering the punishment.  If under the facts and circumstances the jury should conclude that the warden had acted without sufficient reason and exceeded his authority in administering corporal punishment, it would be proper to say that the punishment inflicted in excess of authority amounted to a battery.  If after being assaulted by the warden, or other officer, the convict should slay the person so assaulting, it would be for the jury to say whether the homicide was committed with malice, and therefore was murder, or whether it was the result of a sudden and irresistible impulse of passion caused by the assault, which would reduce the crime to voluntary manslaughter.  Considering the testimony of the warden and guard together, the jury could have found that the mortal blow was given during a combat between the warden and the accused and not until after the accused had been struck by the warden several times in the face with the strap.  They could also have found that the deceased with the other convicts on the chain had been called upon by the warden to assist in disarming the accused in order that corporal punishment might be administered to him by the warden; also that they manifested a willingness to render such assistance, and in the effort to disarm the accused

they tightened the chain on him by force, and continued to do so during the combat between the warden and the accused, and until the latter, after having been struck several times in the face with the strap, turned upon the deceased and dealt the fatal blow. Under such circumstances, if voluntary manslaughter would have been involved had the warden been slain by the accused, the jury could also have found that the deceased was so involved as an abettor as to place him on the same footing with the warden and reduce the killing to voluntary manslaughter. Under the circumstances enumerated, if the act of violence in tightening the chain did not technically amount to an actual assault, or an attempt by the person slain to commit a serious personal injury on the accused, it could have been found to be an equivalent circumstance to justify the excitement of passion and to exclude all idea of deliberation and malice, which, under the provisions of the Penal Code, §65, would reduce the homicide to voluntary manslaughter, if it would have been such an offense to have slain the warden. Ordinarily it would be a reasonable requirement for the convict to surrender the knife when called upon by the warden, but the controversy about the knife was collateral to the principal trouble. It probably arose out of the attempt to inflict corporal punishment. Except for that attempt it is altogether likely that the convict would have surrendered the knife upon command of the warden, but, regarding the attempt as unreasonable, he was provoked to refuse the command. Whether that was the cause of refusal to surrender the knife was a question for the jury. The warden did not see the convicts and could not hear all that was said, and his testimony does not disclose that he learned so much concerning the disturbance among the convicts as would have required the jury to conclude that he was acting in the bounds of reason when he concluded to administer corporal punishment to this particular convict. If the jury had found that the warden was attempting unreasonably to inflict corporal punishment on the accused, his act would have been violative of Penal Code section 1147, and would have amounted to an assault. We think the court erred in failing to give in charge the law of voluntary manslaughter. Our attention has been called to the case of *Jim* v. *State,* 15 *Ga.* 535, where it was held: "The homicide of his master, overseer, or lawful employer, by a slave, in resistance to an assault made upon him, must be either justifiable

homicide or murder." But we think a convict stands upon a different footing from a slave, and his rights are not so restricted as it was ruled in that case with respect to a slave. The convict occupies a different attitude from the slave toward society. He is not mere property without any civil rights, but has all the rights of an ordinary citizen which are not expressly or by necessary implication taken from him by law. While the law does take his liberty, and imposes a duty of servitude and observance of discipline for the regulation of convicts, it does not deny his right to personal security against unlawful invasion. The convict is human, and his passions are subject to influence and as liable to become uncontrollable as if he were not a convict. The law which provides for reducing a homicide from murder to voluntary manslaughter makes no exception of a convict, but contemplates that no homicide by any person shall be classed as murder where there is an absence of malice, and that there may be an absence of malice upon the part of the slayer if the homicide is the result of irresistible passion produced by an assault or some other similar act. While it is the duty of a convict to faithfully execute his sentence and observe the rules of discipline lawfully fixed for his government, he is not bound to submit to unauthorized acts of violence perpetrated or attempted against his person.

*Judgment reversed. All the Justices concur, except*

EVANS, P. J., and LUMPKIN, J., dissenting. We agree with many of the legal principles announced by the majority, but can not concur in their application to the facts appearing in the record. We do not think that the defendant was entitled to a charge on the law of voluntary manslaughter.