## WILLIAM E. ANDERSON *vs.* GABRIEL SALANT, *et al.*

### JANUARY 25, 1916.

PRESENT: Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

*(1) Constitutional Law. Slavery. Contract for Convict Labor.*

In an action of assumpsit to recover for the services of plaintiff while a prisoner, against defendant a contractor for such services under a contract entered into for the labor of the prisoners in the State prison and jail under the provisions of Pub. Laws, 1912, cap. 825, § 21, by the Board of Control and Supply, by which the State agreed to furnish and the contractor to hire the labor of the prisoners, to be employed in the prison, upon machinery and materials furnished by the contractor, at a stipulated price to be paid the State, the contractor to furnish certain employees, who were to be subject to the rules of the Board, and providing further that the Board should at all times have the control of the prisoners, the regulation of their conduct, the assignment of the tasks to be performed and the right to forbid any work or any method of performing the same deemed injurious or subversive of discipline.

*Held,* that as the convict was not delivered to the contractor, the defendant could not become the master even though the enforcement of the contract made the plaintiff a slave, but the only master would be the State and if defendant were guilty of a tort it could only be in receiving from the State the labor of the convict who had been made a slave by the contract between the defendant and the State.

*Held,* further, that if the plaintiff were made a slave by the contract, of which fact defendant would be bound to have knowledge, the receipt of the labor of plaintiff would constitute a tort upon which an implied promise to pay would arise.

*(2) Constitutional Law. Slavery. Contract for Convict Labor.*

While protracted continuous and thorough acquiescence in the provisions of a statute is not conclusive as to its constitutionality, it is a strong argument in its favor and the settled opinion and practice of many legislatures in the reënactment of a statute is entitled to serious consideration, though it has not the authority of a judicial decision.

*(3) Constitutional Law. Slavery.*

Pub. Laws, 1912, cap. 825, § 21, empowering the Board of Control and Supply to make contracts respecting the labor of prisoners, is not in violation of Cons. R. I. Art. I, § 4, "Slavery shall not be permitted in this State."

ASSUMPSIT. Certified on constitutional question.

JOHNSON, C. J. This case is before this court on a constitutional question certified by the Superior Court under Gen. Laws, 1909, Chap. 298, § 1.

The action is in assumpsit on *quantum meruit.*

The question certified is raised by the third count of the declaration which alleges in substance: That the plaintiff on October 10, 1910, was convicted of entering a shop in the night time with the intent to commit larceny, was sentenced to a term of three years imprisonment at hard labor in the State prison, in the county of Providence, and was there imprisoned from October 10th, 1910, to and including June 25th, 1913; that on December 24th, 1912, a contract was entered into between defendant and the Board of Control and Supply, pursuant to Section 21 of Chapter 825 of the Public Laws of 1912, which transferred to the Board of Control and Supply all the power and authority previously vested in the Board of State Charities and Corrections, over the labor of prisoners and other inmates of State institutions, "with power in said board to sell the products of such institutions, and make such contract respecting the labor of the prisoners and inmates of such institutions as said board may deem proper," and provided that "all orders, agreements and contracts made by said board with respect to said labor shall be observed and obeyed by the officers in charge of the prisoners and other inmates of such institutions;" that pursuant to said contract the labor and services of the plaintiff were furnished to the defendant and accepted and hired by it, and the plaintiff was employed by the defendant and for its benefit without the plaintiff's consent and against his will, from January 1, 1913, to and including June 25th, 1913; that during that period the plaintiff was compelled, by force and threats, against his will, to perform labor and services in accordance with the provisions of the said contract, and by his labor and services manufactured shirts in accordance therewith, and the profits from his said labor and services were received and retained by the defendant, subject only to the payment to the State of Rhode Island, pursuant to the terms of the said contract, of the sum of fifty cents (50 cents) per dozen shirts, manufactured through the plaintiff's labor and services; that the

reasonable value of the said services was $3.50 per day, and that no part of the value of the said labor and services, or the product thereof, and no compensation whatever therefor, was ever paid to the plaintiff.

It is further alleged "that said Section 21 of said Act, in authorizing and giving to the said Board power to make such contracts respecting labor of the prisoners as said Board may deem proper, is unconstitutional in that it is repugnant to, and in violation of, Article 1, Section 4 of the Constitution of Rhode Island, and such contract between the said State by the said Board, and the defendant, the Crescent Garment Company, is, therefore, illegal, null and void."

A fictitious promise by the defendant in consideration of the premises to pay the plaintiff the reasonable value of his services, amounting to the sum of one thousand dollars ($1,000), and the breach of that promise, are then alleged.

The contract in question is made a part of the third count, and annexed thereto as "Exhibit A."

Its material provisions are: the State agrees to furnish, and the company agrees to accept and hire, the labor and services of not less than two hundred and fifty inmates of the Rhode Island State Prison and of the Providence County Jail. The contract however provides that if the State can furnish more, or cannot furnish so many as two hundred and fifty, the company shall accept the services of such number as can be furnished, it being understood that all available inmates shall be furnished.

Such inmates are to be employed in the factory within the prison in making shirts, with machinery and materials furnished by the company, which is to pay to the State fifty cents per dozen for all shirts manufactured under the contract. It is provided that the working day shall last from "7 or 7:30 A. M. to twelve noon, and from 1 P. M. to 4:30 or 5:30 P. M.; and on Saturday from 7 or 7:30 A. M. to 12 noon." The company is to employ a superintendent and assistants, subject to the approval of said board, and said employees are always to be subject to such rules and regulations as said board may prescribe.

The sixth section is as follows: "SIXTH. The party of the second part further agrees to impart all needful instructions to said inmates employed hereunder in the manufacture of said shirts and to employ at its own expense a superintendent and such other assistants as may be necessary to impart such instructions and to direct and superintend the manufacture of said shirts, but the employment of said superintendent and said assistants shall be subject to the approval of the Board of Control and Supply, on behalf of the party of the first part, and said superintendent and assistants shall at all times be subject to such rules, regulations and limitations as said Board of Control and Supply may from time to time prescribe, the said Board of Control and Supply reserving the right to deny admission to or to eject from said factory any person whom said Board may for cause regard as objectionable, or whom said Board may deem guilty of any violation of the rules of said prison or of any breach of conduct therein; and it is understood and agreed that said party of the first part shall at all times have the right to control and govern said inmates, to regulate their conduct and to assign the tasks to be performed under this agreement, and further to make and institute all rules and regulations for the proper discipline and guidance of said inmates, and at any time to change the same, and further to forbid and prevent any work, or any manner or method of performing the same, that may be deemed injurious to the health, dangerous to the person or subversive of prison discipline."

When it appeared that the third count of the declaration brought in question the constitutionality of Section 21 of Chapter 825 of the Public Laws, 1912, the Superior Court certified the case to this court for the determination of the constitutional question.

It is necessary first to consider whether the determination of the constitutional question is necessary for the disposition of the case.

The plaintiff alleges that pursuant to said contract the labor and services of the plaintiff were furnished to the defendant and accepted by it; that he was employed by the defendant, and that he was compelled by force and threats against his will to work for the defendant. He does not allege that he was so compelled to labor by the defendant; and that allegation cannot be inferred for him. The compulsion of which he complains, therefore, must have been exercised by the State, and if the statute was invalid the wrong done the plaintiff in compelling him to work for the defendant was done by the State. If however the contract made under said Section 21 reduced the plaintiff to the condition of slavery it may be argued that the defendant would be liable to an action of assumpsit upon a tort committed by it in receiving said labor. In so receiving the labor of the plaintiff was the defendant guilty of a breach of duty which it owed to said plaintiff ? If so, did said breach of duty violate a right of the plaintiff ? Clearly there was neither a breach of duty nor a violation of right unless said contract and its enforcement reduced the prisoner to the condition of a slave. He could not have been the slave of the defendant for under the contract the control over him was reserved to the State. If the State was the master of the plaintiff as a slave, it clearly only became such by virtue of the contract with the defendant and the carrying out of the same, as prior thereto it was simply the custodian of a convict sentenced to the State prison for a definite term at hard labor. If the State thus became the master of the slave, the wrong done the plaintiff by the defendant could only consist in entering into said contract and receiving under it the labor of the plaintiff, and thereby assisting in the completion of the transformation of the condition of the plaintiff from that of a convict into that of a slave.

Where the labor of a convict has been received by a contractor under a contract which was illegal either through want of authority to make the contract, or a void commitment, or holding to labor after a valid commitment had

expired, it has been held that the law will raise an implication of a promise upon the basis of the tort so committed by the contractor.

Thus in *Greer* v. *Critz*, 53 Ark. 247, the statute placed the management and control, and the hiring of convicts under the jurisdiction of the county courts. Under a contract with the judge of the county court, in vacation of the court, the convict was delivered to the contractor to work out his fine and worked for the contractor under said contract. The court held that there was no power or authority given by the statute to the judge of the county court, in vacation of said court, to make a contract for that purpose, which could be done alone by the order of the court itself; and held that the defendant, being a party to the contract, was bound to know of this lack of authority, and that as he had the benefit of the plaintiff's services he was obliged to pay for them.

In *Patterson* v. *Crawford*, 12 Ind. 241, a person was convicted and sentenced to the penitentiary by a court which had no jurisdiction, and was compelled by the warden to labor for a contractor. The court, p. 244, said: "That the defendant knew of the labor charged in the complaint, and assented to it, is a proposition which the facts appearing in the record will not allow us to doubt; and for aught that appears in the defense in question, he did know that *Armstrong* had not been legally convicted. The defendant, being lessee of the State prison, and entitled by law to the labor of all those legally imprisoned and of no others, had a right to know, and was, in our opinion, bound to know who were legally in the warden's custody. But there is really nothing in the second defense inconsistent with the fact of the work having been done for the defendant at his request, and with his knowledge of all the circumstances."

In *Patterson and Another* v. *Prior*, 18 Ind. 440, the court, p. 442, said: "At the time the appellee was convicted and sent to the penitentiary, the Court of Common Pleas had no jurisdiction in that behalf; hence, the conviction and judg-

ment were nullities, and furnish the appellants no protection for the tort committed in confining him in the penitentiary, *Patterson v. Crawford*, 12 Ind. 241. The appellants must be presumed to have known the law, and that they had no legal right to imprison the appellee, or cause him to labor. That they may have been responsible to him in some form can not be doubted. They undoubtedly committed a tort, and the question here is, whether the tort can be waived, and an action maintained on an implied assumpsit?

"We will first examine this question so far as it relates to *Patterson*. He, it seems, was the lessee of the penitentiary, and received all the benefit of the appellant's labor. He must be presumed to have assented to the performance of the labor, and being benefitted thereby, the law implies a promise to pay what it is reasonably worth." . . . "In our opinion, so far as *Patterson* is concerned, the tort may be waived, and an action be maintained on the implied assumpsit. The case, however, is entirely different as to *Miller*, the warden of the penitentiary. He received no benefit of the plaintiff's labor, and not having been benefitted, there is, as to him, no consideration to support an implied assumpsit to pay."

In *Tenn. Coal, Iron & R. Co.* v. *Butler* (Ala. June 4, 1914), 65 So. 804, the court said: "Alex Butler was convicted of petit larceny. He was sentenced to hard labor for 110 days as punishment for the crime. The costs in the cause amounted to $29.35, and he was sentenced to additional hard labor for the county until the costs were paid at the rate of 40 cents per day. Under the law the defendant was entitled to work out his costs at the rate of 75 cents per day, instead of at the rate of 40 cents per day. When, therefore, the prisoner had performed hard labor for the county for the period for which he was sentenced as punishment for his crime, and had also performed additional hard labor for a sufficient number of days at the rate of 75 cents per day to pay his costs, he was then entitled to his discharge, and any

further imprisonment of the prisoner became illegal. *Ex parte Haley,* 1 Ala. App. 528, 56 South, 245. The judgment of the court sentencing the prisoner to hard labor showed the above situation. *Ex parte Haley, supra."* . . . "The *law* definitely fixed the exact date upon which this convict's term expired, and any labor which the appellant required him to perform *after* that date was without warrant of law, at a time when the appellant had no legal right to the custody of the convict, and at a time when the law may well raise an implied contract to pay him for the value of his services."

(1)    In the case at bar, the convict was not delivered to the contractor. The defendant therefore could not become the master even though the making and enforcement of the contract made the plaintiff a slave. The only possible master in such case would be the State which retained the control of the convict. If the defendant was guilty of a tort, therefore, it could only be in receiving from the State the labor of the convict who had been made a slave by the contract into which defendant had entered with the State.

If the plaintiff was so made a slave and the defendant, knowing him to be a slave so received his labor, we think such conduct on the part of the defendant would constitute a tort upon which the law would raise an implication of a promise to pay therefor. Would he be bound to have that knowledge ? We are unable to say that he would not be so bound. The plaintiff's case rests entirely upon his assumption that by the contract made under the statute and its enforcement he was made a slave. That can only be determined by the decision of the constitutional question certified. We will therefore consider the constitutional question.

Section 4 of Article 1 of the Constitution reads:

"Slavery shall not be permitted in this state."

We do not need to follow the elaborate arguments of plaintiff's counsel to come to the conclusion that the clause of the Rhode Island Constitution under consideration had the same effect upon slavery as the Thirteenth Amendment

to the Federal Constitution, and that slavery as a legal status ceased to exist within this State upon its adoption. And we have no doubt that like the Thirteenth Amendment said provision of the Rhode Island Constitution, while designed to forbid slavery as it existed in this country and as it had existed in Rhode Island, doubtless applies equally to all races of men.

Was the aforesaid condition of the plaintiff slavery?

Black's Law Dictionary (2nd ed.), p. 1092, gives the following definitions: "Slave. A person who is wholly subject to the will of another; one who has no freedom of action, but whose person and services are wholly under the control of another."

Webster: "One who is under the power of a master, and who belongs to him; so that the master may sell and dispose of his person, of his industry, and of his labor, without his being able to do anything, have anything, or acquire anything, but what must belong to his master. Civ. Code La. Art. 35."

"Slavery. The condition of a slave; that civil relation in which one man has absolute power over the life, fortune, and liberty of another."

In 3 Bouvier's Law Dictionary, 3082, a slave is defined as "One over whose life, liberty, and property another has unlimited control.

"Every limitation placed by law upon the absolute control modifies and to that extent changes the condition of the slave. In every slaveholding State of the United States the life and limbs of a slave were protected from violence inflicted by the master or third persons."

Webster's New International Dictionary defines a slave as "A person held in bondage to another; one held as a chattel; one whose person and services are under the control of another as owner or master."

The Century Dictionary gives the following definitions: "Slave: A person who is the chattel or property of another and is wholly subject to his will."

"Slavery: (1)   A state of servitude; the condition of a slave; bondage; entire subjection to the will and commands of another; the obligation to labor for a master without the consent of the servant; the establishment of a right in law which makes one person the absolute master of the body and the service of another; (2)   The keeping or holding of slaves; the practice of keeping human beings in a state of servitude or bondage."

In *Douglass* v. *Ritchie,* 24 Mo. 177 (A. D. 1857), p. 180, the court said:   "Our system of slavery resembles that of the Romans rather than the villenage of the ancient common law, and hence both the community and the courts have looked to the Roman rather than to the old common law of England for rules applicable to it."   (Citing cases.)   "Under the former law, slaves were *things* and not *persons;* they were not the subjects of civil rights, and of course were incapable of owning property or of contracting legal obligations; they and all that appertained to them belonged to their master, and they were under his dominion.   In a word, slavery was then defined to be 'an institution by which one man is made the property of another.'   (Just. Inst. lib. 1, tit. 3) and such undoubtedly is our African slavery; and accordingly the slave's incapacity to be the subject of civil rights—as to own property, or contract a legal obligation—which flows from the nature of the institution, is adopted by our people in practice and recognized in the decisions of our courts."

In *Westbrook* v. *State,* 133 Ga. 578, a convict had been convicted of murder, and the case was before the Supreme Court on exceptions. The court, p. 583, said: "Upon conviction the convict may lose his liberty for the time being, and may be required to perform hard labor, but he does not lose security of his person against unlawful invasion. The security of person, except as expressly provided by statute, remains his right; and if it be unlawfully invaded, he may resist such unlawful invasion as if there had been no conviction."

(p. 584) "Our attention has been called to the case of *Jim* v. *State*, 15 Ga. 535, where it was held: 'The homicide of his master, overseer, or lawful employer, by a slave, in resistance to an assault made upon him, must be either justifiable homicide or murder.' But we think a convict stands upon a different footing from a slave, and his rights are not so restricted as it was ruled in that case with respect to a slave. The convict occupies a different attitude from the slave toward society. He is not mere property without any civil rights, but has all the rights of an ordinary citizen which are not expressly or by necessary implication taken from him by law. While the law does take his liberty, and imposes a duty of servitude and observance of discipline for the regulation of convicts, it does not deny his right to personal security against unlawful invasion."

In Laws of Rhode Island, 1798, page 607, an act relative to slaves and their manumission and support, it is provided:

"Sec. 8. And be it further enacted, That no person born within this state on or after the first day of March, A. D. 1784, shall be deemed or considered a servant for life, or a slave; and that all servitude for life, or slavery of children to be born as aforesaid, in consequence of the condition of their mothers, be and the same is hereby taken away, extinguished, and forever abolished.

"Sec. 9. And be it further enacted, That every child born on or after the said first day of March, A. D. 1784, whose mother is or shall be a slave, shall be supported and maintained by the owner of the mother, until such child arrive at the age of twenty-one years: *Provided,* the owner of the mother shall, during that time, hold her in slavery."

These sections without change appear in Public Laws, 1822, page 443, and were in force until 1844.

The expressions used in said Section 8 "a servant for life, or a slave," and "all servitude for life, or slavery," indicate clearly that slavery and servitude for life were considered interchangeable expressions. Moreover, the use of the word "owner" in Section 9 shows that slavery was considered

to be the ownership of one human being by another. The word "slave" as used in the above statute clearly meant a person held under the well-known institution of slavery. The members of the convention living under this statute would naturally have it in mind when they used the word *slavery* in the constitution and would use it with the same meaning.

The rights of a prisoner in Rhode Island are far wider than those of a slave. A slave had no property rights whatever and could neither sue nor be sued, except that he might sue to enforce his freedom. In Cobb on Slavery, p. 235, it is said "of . . . the right of private property the slave is absolutely deprived," and page 238, "a slave cannot take by descent, there being in him no inheritable blood."

The rights of a prisoner in Rhode Island in regard to property and access to the courts are as follows: Gen. Laws, 1909, Chap. 354, § 35. "No conviction or sentence for any offence whatsoever shall work corruption of blood or forfeiture of estate." Section 36 provides that every person convicted of murder or arson is civilly dead. Section 53. "No person who shall be sentenced to imprisonment in the state prison shall have any power, during his imprisonment, to make any will or any conveyance of his property or of any part thereof."

These statutes are construed and the whole subject discussed in *Kenyon* v. *Saunders*, 18 R. I. 590 (1894), where it was held that a man in prison for a term of years for felony has such an interest in the personal estate of his wife, if she died intestate, as to entitle him to contest the validity of the will, although he could not administer on her estate, and that he was entitled to prosecute an appeal from the decree of the probate court admitting his wife's will to probate and to give the bond required by statute in order to take an appeal. STINESS, J., said: "If it should be held that his conviction deprives him of the right to appeal, then he would thereby also be deprived of the power ever

to enforce his right to the property itself. . . . A convict is neither civilly dead, nor deprived of his rights of property; and, if this be so, he should be entitled to enforce such right when it is necessary to do so." The opinion goes on to hold that the convict may give a valid appeal bond. Thus a convict can have an interest in property while a slave can not; a convict can sue while a slave cannot. This distinction remains whether or not the convict's labor is subject to a contract. While his rights are considerably limited because of his imprisonment he still retains many important rights which a slave lacks.

Employment of prisoners at hard labor existed before the adoption of the Constitution. Section 10 of Chapter 8 of An Act concerning crimes and punishments, passed February 3, 1838, Pub. Laws, 1822-42, p. 981, provided: "Every person who shall be sentenced to imprisonment for life or the term of one year or more for any one offence, shall be imprisoned in the State prison at Providence, and there kept at hard labor, in separate confinement."

While no contracts for the labor of convicts have been shown before 1842, when our constitution was drafted, the Act "Of the officers and discipline of the State Prison," Chap. 10, § 1, enacted February 3, 1838 (Pub. Laws, 1822-42, p. 999), provides that the inspectors of the State prison "shall advise with the warden as to the purchase of necessary supplies and provisions for the convicts and materials to be manufactured by them, and as to the sale of all articles made in the said prison" . . . "nor shall they be in any way interested in any contract for the supplies of the same, or the labor of the convicts." The constitution was drafted by the convention November 5, 1842, and by its provisions was to go into effect, if adopted, on the first Tuesday of May, 1843. June 27, 1845, the General Assembly passed an act providing that "the keeper of each county jail, except the jail of the county of Providence, shall be allowed in full for his services under this Act, fifty per cent. of all the profits on the labor done under his care and over-

sight by persons committed to such jail." Pub. Laws,. 1844-57, p. 625.

The first act specifically providing for letting the services. of prisoners by contract is Public Laws of Rhode Island (1844-57), p. 672, January, 1847, Section 4, of which provided: "The warden, under the direction of the inspectors, may let the services of the prisoners to contractors for the kinds of work before specified." A similar provision is included in every subsequent revision of the statutes to and including (2) Gen. Laws, 1909, Chap. 360, §§ 9, 12. Thus, although the validity of prison labor contracts has never been before our courts it has been repeatedly recognized by legislatures during a period of certainly sixty-eight years. During all that time it has never been publicly questioned until the present suit was brought. While such protracted, continuous. and thorough acquiescence is not conclusive, it is a strong argument; and the settled opinion and practice of many legislatures is entitled to serious consideration before it is. overthrown, even though it has not the authority of a. judicial decision.

The plaintiff's counsel cite definitions of slavery from. *Plessy* v. *Ferguson,* 163 U. S. 537; *Hodges* v. *United States,* 203 U. S. 1; *Civil Rights Cases,* 109 U. S. 3.

In *Plessy* v. *Ferguson,* at page 542, slavery was defined as. follows: "Slavery implies involuntary servitude—a state of bondage; the ownership of mankind as a chattel, or at. least the control of the labor and services of one man for the benefit of another, and the absence of a legal right to the disposal of his own person, property and services."

In *Hodges* v. *United States,* at page 17, it was said: "A reference to the definitions in the dictionaries of words whose meaning is so thoroughly understood by all seems an affectation, yet in Webster 'slavery' is defined as 'the state of entire subjection of one person to the will of another.' "

In *Civil Rights Cases,* at page 22, the court said: "The long existence of African slavery in this country gave us very distinct notions of what it was, and what were its necessary

incidents. Compulsory service of the slave for the benefit of the master, restraint of his movements except by the master's will, disability to hold property, to make contracts, to have a standing in court, to be a witness against a white person, and such like burdens and incapacities, were the inseparable incidents of the institution."

In their argument plaintiff's counsel select the definition from *Plessy* v. *Ferguson, supra,* as the "most careful and accurate one to be found in the books." In commenting upon it they pass by the first part, viz.: "Slavery implies involuntary servitude—a state of bondage; the ownership of mankind as a chattel," and say: "According to this definition the elements of slavery are: (1) the control of the labor and services of a person, (2) for the benefit of another, and (3) the absence of a legal right in the former to the disposal of his own person, property and services. We submit that these elements clearly exist under the contract by which the plaintiff was compelled to work for the defendant in the present case. (1) The labor and services of the plaintiff were controlled directly by the contractor, and he was compelled by force and threats, against his will, to perform the tasks assigned to him. (2) The benefit or profit from his services accrued to the contractor, subject to the fixed payments to the State; the plaintiff himself was entitled to no benefit from those services. (3) The plaintiff was without legal right, under the contract, to dispose of his person, property or services, either by working for the State, some other contractor, or himself, or by not working at all. As to his person and services this is clear. His right to the disposal of his property was equally non-existent: A convict may not make a will or any conveyance of his property or any part thereof during his imprisonment. *Kenyon* v. *Saunders,* 18 R. I. 590, 592; Public Statutes of Rhode Island, cap. 248, § 52."

The statement that the labor and services of the plaintiff were controlled directly by the contractor is not borne out by the allegations of plaintiff's declaration or by the pro-

visions of the contract annexed thereto. The compulsion alleged in the third count of the declaration is not set out as that of the defendant. As to the benefit or profit from his services, his labor was a part of his sentence, and was furnished to the contractor by the State for a compensation fixed in the contract. His inability to dispose of his person, or services, did not arise from the contract, but from his status as a convict under sentence in prison. His services being a part of his sentence could not be disposed of or controlled otherwise than by the State. His disabilities in regard to the disposal of his property are due to the provisions of the statutes, applicable alike to all convicts and were not imposed by the contract made under said Section 21 of Chapter 825 of the Public Laws.

Plaintiff's counsel say in their brief: "It may finally be contended that our reasoning carries us too far and, if adopted, would lead to the result that the State cannot compel convicts to labor *for itself*, either without compensation or at a compensation fixed by the State.

"That problem is not now before this court. The only question now under consideration is whether uncompensated *contract* labor by convicts is within the constitutional prohibition; any additional questions of this nature may be dealt with when they arise. Hence, we need neither affirm nor deny that either of the situations suggested would violate the constitutional prohibition.

"At the same time, it is proper to call the court's attention to the clear distinction which exists between the status of a convict who is obliged to work for the state and that of the convict who is compelled to labor for any one to whom the state sees fit to let or sell his services. The former is slavery as defined in *Plessy* v. *Ferguson, supra*: 'a control of the labor and services of one man for the benefit of another, and the absence of a legal right to the disposal of his own person, property and services.' But the latter is slavery in the strictest sense of the word; it is chattel slavery such as existed in the South prior to 1870. The distinctive feature of that

slavery was 'the ownership of mankind as a chattel,' involving as it did a right in the owner to lease or sell his slave at will.   Here the State stands in the place of owner, and the contractor is the lessee, or purchaser for a term of years, of the services of the convict.   This amounts in substance to a disposal of the convict himself, since it entails of necessity the practical control of the convict's person, as well as his services, by the lessee's agent.   It is true that the latter has not an absolute power over the convict's person.   Neither did the lessee of a slave in *ante-bellum* days:   he was obliged to use reasonable care and moderation in the treatment and discipline of the slave hired by him, and was liable to the owner for any injury resulting from an abuse of his power."

Plaintiff's counsel have thus furnished a definition of the kind of slavery they seek to establish, not "The status of a convict who is compelled to work for the state," which they claim is slavery as defined in *Plessy* v. *Ferguson, supra,* but "That of the convict who is compelled to labor for any one to whom the State sees fit to let or sell his services."   Of this they say:   "The latter is slavery in the strictest sense of the word; it is chattel slavery such as existed in the South prior to 1870.   The distinctive feature of that slavery was 'the ownership of mankind as a chattel,' involving as it did a right in the owner to lease or sell his slave at will."

The condition of slavery sought to be established is a synthetic slavery made up from the incidents inherent in the condition of being a convict lawfully under sentence and the fact that said convict was compelled to work pursuant to the contract made under the statute.

As we have seen, the alleged direct control by the contractor is not present.   The plaintiff's inability to dispose of his person, property and services, is in no way due to the contract of which he complains, but is an incident of his condition as a convict.   Then, on the other hand, there are present rights which are not those of a slave, as the right to sue and to enter into a contractural obligation in the necessary prosecution of his suit; and in short all the rights of

an ordinary citizen which are not necessarily taken from him by reason of his condition as a convict. The condition of alleged slavery which he has constructed fills the requirements of no definition, which have been cited, not even the one he selects as the most accurate one to be found in the books. That requires "a state of bondage—the ownership of mankind as a chattel." That portion of the definition he passes by and depends upon the remaining portion, viz.: "at least, the control of the labor and services of one man for the benefit of another, and the absence of a legal right to the disposal of his own person, property and services." Of the portions thus selected, the words: "the control of the labor and services of one man for the benefit of another" constitute the sum total of material for the construction of the condition of slavery claimed, as "the absence of a legal right to dispose of his own person, property or services" is incident to his legal status as a convict under sentence for a term in State prison, and does not in any way result from the contract. As to said first part of said selected portion of the definition, his counsel seem to recognize the necessity of a master for the slave and say that "the labor and services of the plaintiff were controlled directly by the contractor," which is not alleged in the declaration, adding "and he was compelled by force and threats, against his will, to perform the tasks assigned him," which last is alleged in the declaration, but the declaration fails to allege that he was thus compelled by the defendant.

As we have seen, it is not claimed that to cause a prisoner to work for the State is a violation of the constitutional provision forbidding slavery, but that to cause him to work upon the materials of another than the State, under a contract between such other person and the State, in the prison of the State, under the control of the State, the State receiving compensation for said work and the convict not receiving compensation therefor, results in the transformation of the labor which is imposed upon the convict as a part of his sentence, into that of a slave, and constitutes a condition

of slavery. If this contention is sound, it follows that while the State may compel the convict to work for the State upon the materials of the State in its workshop situated in the prison, the State must own the materials upon which the work is done or the convict cannot lawfully be compelled to work. The State must therefore engage in business in which it directly employs the convict upon its own materials or it cannot lawfully compel him to work at all.

Does the convict work any the less for the State when he is compelled to work upon the property and with the appliances of a contractor with the State, in the prison of the State under the control of the State, for a wage paid to the State by the contractor under a contract made with the State, than when he so works upon materials owned by the State ? It is claimed that he is compelled to work for the benefit of another and not for the State. True, his labor is done upon materials which are not the property of the State. The contractor with the State, however, only has the labor done thereon for which he pays the State, and which it was the right of the State to have done as a part of the sentence imposed upon the convict. We cannot think that the condition of the convict is changed by such work upon the materials of the contractor from his condition as a convict into that of a slave, either of the State or the contractor.

We see no reason to doubt that, in adopting Section 4 of Article I of the Constitution, the convention and the people had in mind slavery as it then existed in some of the states of the Union and as it had existed in this State.

The word "slavery" at that time was used both in our statutes and in common parlance to mean a very definite thing, namely, the institution of slavery. We see no reason to suppose it was used in the constitution in any other sense. The fact that prison labor existed, without question, contemporaneously with the adoption of the constitution is also strong evidence that the prohibition was not intended to include such labor. The long acquiescence in the legislative exercise of the power to let prison labor, beginning

January, 1847, is also a strong argument in favor of the validity of that power.

We are of the opinion that the plaintiff has entirely failed to establish his contention that his status under said contract was that of a slave.

Because the statute empowers the Board of Control and Supply to "make such contract respecting the labor of prisoners and inmates of such institutions as said board may deem proper," and provides that "all orders, agreements and contracts made by said board with respect to said labor shall be observed and obeyed by the officers in charge of the prisoners and other inmates of such institutions," plaintiff's counsel argue that the statute "obviously authorized the board to delegate to the contractor complete control over the person and the conduct of the prisoner while at work (subject to the restrictions as to corporal punishment heretofore noted), as well as over his labor;" that "the power conferred on the board and not the extent to which it is exercised is the test of the statute's validity," and "that a court, in passing on the constitutionality of a statute, is not confined to its language, but may look to its necessary or natural effect and its natural operation."

Section 21 of Chapter 825, Pub. Laws, 1912, reads: "Sec. 21. All the power and authority now vested in, and exercised by, the board of state charities and corrections over the labor of prisoners and other inmates of the institutions now under the control and management of the board of state charities and corrections are hereby transferred to and vested in the board created by this act, with power in said board to sell the products of such institutions and make such contract respecting the labor of the prisoners and inmates of such institutions as said board may deem proper, and all orders, agreements and contracts made by said board with respect to said labor shall be observed and obeyed by the officers in charge of the prisoners and other inmates of such institutions. For the purpose of the performance of their duties under this act the members of the board shall have all the

powers and privileges conferred upon and enjoyed by the members of the state board of charities and corrections under the provisions of Chapter 360 of the General Laws, and any acts in amendment thereof, of visiting such institutions and conferring with the prisoners and inmates therein."

The only labor for which contracts are authorized by the statute is that of prisoners and inmates of the institutions. All orders, agreements, and contracts with respect to such labor are to be observed and obeyed by the officers in charge of the prisoners and other inmates of the institutions. The board is authorized to visit such institutions and confer "with the prisoners and inmates therein."

It is evident that the statute contemplates only the labor of such prisoners and inmates while prisoners and inmates of the institutions. There is no indication of an intent to authorize the making of a contract whereby the State shall part with or permit any interruption of its lawful control over said prisoners and inmates. The statute authorizes the board to "make such contract respecting the labor of prisoners and inmates of such institutions as it may deem proper." This can only mean a contract respecting such labor; and there cannot be imported into the statute the authority on the part of the board to interfere with or to modify or to terminate the lawful control of the State over said prisoners and other inmates of the institutions. The discretion given to the board in the making of such contracts is a lawful discretion as to the subject-matter of such contracts, and does not authorize the exercise of arbitrary power by the board in disposing of the control and custody of the prisoners and inmates of the State institutions. We find nothing in the statute which violates the constitutional provision forbidding slavery or which in its necessary or natural operation tends to bring about such a result.

Our decision is that Section 21 of Chapter 825 of the Public Laws of Rhode Island, January, 1912, is not in violation of Article I, § 4 of the Constitution of Rhode Island.

The papers in the case with our decision indorsed thereon will be returned to the Superior Court for the counties of Providence and Bristol for further proceedings.

*Fred A. Otis*, for plaintiff.
*George Gordon Battle, Karl W. Kerchway*, of counsel.
*Herbert A. Rice*, for defendant.
*Zechariah Chafee, Jr.*, of counsel.
*Irving Champlin, James Harris*, for Crescent Garment Co.
*John C. Knowles*, of counsel.