William King JACKSON, Appellant,

v.

O. E. BISHOP, Superintendent of the
Arkansas State Penitentiary,
Appellee.

Lyle Edward ERNST, Jr., Appellant,

v.

O. E. BISHOP, Superintendent of the
Arkansas State Penitentiary,
Appellee.

Grady W. MASK, Appellant,

v.

O. E. BISHOP, Superintendent of the
Arkansas State Penitentiary,
et al., Appellees.

Nos. 18957–18959.

United States Court of Appeals
Eighth Circuit.

Dec. 9, 1968.

Edward L. Wright, of Wright, Lindsey & Jennings, Little Rock, Ark., and William S. Arnold, Crossett, Ark., for appellants and filed brief.

Don Langston, Asst. Atty. Gen. of Arkansas, Little Rock, Ark., for appellee; Joe Purcell, Atty. Gen. of Arkansas, and R. D. Smith, III, Asst. Atty. Gen. of Arkansas, Little Rock, Ark., were with him on the brief.

Before VAN OOSTERHOUT, Chief Judge, BLACKMUN, Circuit Judge, and VAN PELT, District Judge.

BLACKMUN, Circuit Judge.

The three plaintiffs-appellants, inmates of the Arkansas penitentiary,[1] in separate actions call upon us to direct the entry of an injunction barring the use of the strap as a disciplinary measure in Arkansas' penal institutions. The claim is that the district court

> erred in refusing to hold that corporal punishment of prisoners is cruel and unusual punishment within the meaning of the Eighth Amendment to the United States Constitution, and in holding that the whipping of prisoners was not unconstitutional per se.

The plaintiffs' cases are not dissimilar, in tone and complaint, to an earlier non-class action by another trio of Arkansas prisoners. Talley v. Stephens, 247 F.Supp. 683 (E.D.Ark.1965). Chief Judge Henley in *Talley* granted, in part by consent, a substantial measure of relief, including restraint against forcing prisoners to work beyond their physical capabilities, against the withholding of reasonable medical attention, against the infliction of corporal punishment until "appropriate safeguards" were established, and against reprisals for seeking access to the courts. Neither side appealed.

The present cases were filed in the Eastern District of Arkansas and were assigned respectively to Judge Young and Judge Harris. Upon agreement, the judges consolidated the three actions and, as a panel of two, jointly heard and decided them. After a full hearing, the court granted relief against "[t]he use of any such devices as the crank telephone or teeter board" and against "[t]he application of any whipping to the bare skin of prisoners." It also restrained the use of the strap "until additional rules and regulations are promulgated with appropriate safeguards * * *" Jackson v. Bishop, 268 F. Supp. 804, 816 (E.D.Ark.1967).

The use of the strap, therefore, as in the *Talley* case, was not totally restrained. Because it was not, the plaintiffs appeal and seek here to remove that vestige. The defendant Superintendent has taken no cross appeal. Thus, the relief granted in the district court remains effective and is not in issue before us.

We conclude that the plaintiffs are correct in their position and that Arkansas' use of the strap, irrespective of safeguards, is to be enjoined.

These actions were instituted in 1966 by handwritten petitions employing varying titles.[2] Each plaintiff asked

---

1. Plaintiff Jackson is presently on parole.

2. Jackson ("Petition for a writ of habeas corpus"); Ernst ("Petition for writ of mandamus"); Mask ("Motion and petition for physical examination * * * also a federal restraining order * * *"). None of the plaintiffs questions the legality of his confinement or claims that he is entitled to release.

for the appointment of counsel and permission to proceed in forma pauperis. Those requests were granted. Appointed counsel then filed amended complaints which have been treated by all concerned as petitions for injunctive relief under the civil rights statutes, 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3) and (4). We are satisfied as to jurisdiction. We are also satisfied, as were the district judges, that the cases are appropriately to be regarded as class actions within the scope and reach of Rule 23, Fed.R.Civ.P.

We initially commend Edward L. Wright of Little Rock and William S. Arnold of Crossett, court-appointed counsel for the plaintiffs, and Don Langston, who argued the cases for the defendant, for their candid, unemotional and fair and able presentations. The services rendered by Mr. Wright and Mr. Arnold, and the expenses they have incurred, were without anticipation of reimbursement.

Although we are advised that a substantial percentage of the Arkansas prison population is black, the three plaintiffs, the prison officials concerned, and the witnesses are all white. No issue of race, as such, is present.

The facts, at this stage of the litigation, are in no real dispute.[3] Anyone interested in all the details may refer to the facts recited by Chief Judge Henley in his opinion in Talley v. Stephens, supra, and to those set forth in the opinion of the district judges in this case. We regard the following history and facts as particularly pertinent for our review:

1. The Arkansas penal institutions are under the general supervision of a five-man "honorary" commission known as the State Penitentiary Board. Ark. Stat.Ann. §§ 7–201(6) and 7–202 and § 46–101. Actual day-to-day supervision is delegated by the Board to a full-time compensated superintendent. §§ 46–104 and 46–104.1. The Board also serves as a board of pardons and paroles and meets monthly. § 43–2801.

2. The State's penitentiary system contains two farm units. Cummins Farm, near Grady, Arkansas, has 15,500 acres and over 1,600 inmates. Tucker Farm, near Tucker, Arkansas, has about 4,500 acres and approximately 250 inmates. The Superintendent resides at Cummins. An assistant superintendent is at Tucker. The units are about 50 miles apart.

3. The Board has the duty to publish and appropriately post all rules and regulations it promulgates with respect to prisoner conduct. § 46–132. The Superintendent has "general supervision and control of" and is "solely responsible for, the discipline, management, and control" of all inmates. § 46–133.

4. The Superintendent, by statute, is authorized to use trusties as guards. § 46–122. In fact, trusties are used at Cummins and Tucker in supervisory and overseeing capacities in the barracks and fields and as guards. Trusties are selected by the Superintendent or his assistant. There are also supervisory wardens at both units.

5. The primary activity of inmates is agricultural work with row crops and garden produce. However, a dairy herd and a beef herd are also maintained. The system is virtually self-sustaining so far as food is concerned.

6. The Board, by statute, § 46–158, has the duty to prescribe the mode and extent of punishments for violation of prison rules. One who inflicts, or causes to be inflicted, punishment more severe than is prescribed by the Board is guilty of a felony. Section 46–158, however, does not itself specify the type of punishment which may be imposed.

---

3. The parties have stipulated that "the facts * * * as found and stated relative to physical facts, methods of corporal punishment and organization of Cummins Farm and Tucker Farm, as they existed prior to and at the time of trial in the case of and as reflected by the printed opinion in the case of Talley v. Stephens, 247 F.Supp. 683, are true and correct and may be considered by the Court in these proceedings."

7. Corporal punishment in the Arkansas system was authorized formally only in 1962 but evidently it had been employed for many years. At that time the Board, by resolution, authorized such punishment whenever, in the Superintendent's judgment, its infliction was necessary in order to maintain discipline. The resolution did not prescribe form or limit of punishment.

8. In the *Talley* action, the three petitioning inmates sought injunctive relief with respect to certain prison practices including the infliction of corporal punishment. The respondent there, a predecessor superintendent, consented to the granting of relief with respect to work requirements beyond a prisoner's physical capability and with respect to reasonable medical attention. 247 F. Supp. at 687. Chief Judge Henley found that, at that time, there were no written rules as to whipping; that such punishment was administered in the sole discretion of the one inflicting it, subject to an informal requirement that the blows not exceed ten for a single offense; and that two of those three petitioners had been whipped and one beaten by a field-line supervisor-trusty. The judge noted that the Supreme Court of Arkansas, over 80 years ago, deplored the whipping of convicts, Werner v. State, 44 Ark. 122 (1884), and that the Arkansas statutes do not themselves specifically prescribe whipping even as a punishment for crime.[4] He observed, however, that corporal punishment had not been viewed historically as a constitutionally forbidden cruel and unusual punishment. The court concluded that it was not prepared to say that such punishment was unconstitutional per se. Nevertheless, Judge Henley said, 247 F.Supp. at 689, this conclusion presupposes that the infliction of such punishment is surrounded by appropriate safeguards, that is, it must not be excessive, it must be inflicted dispassionately and by responsible people, and it must be applied under recognizable standards so that the convict knows what

conduct will cause him to be whipped and how much punishment his conduct will produce. The court found that those safeguards did not exist in the Arkansas system and enjoined further corporal punishment of the petitioners until they were established.

9. The *Talley* opinion was filed on November 15, 1965. As a result, the Board issued written rules and regulations on January 10, 1966. These were in effect until the district court decision in the present case was rendered June 3, 1967. In addition to a number of other provisions, the rules state that certain "major offenses will warrant corporal punishment." The ones listed are homosexuality, agitation, insubordination, making or concealing weapons, refusal to work when medically certified able to work, and participating in or inciting a riot. They further state:

No inmate shall ever be authorized to inflict any corporal punishment under color of prison authority on another inmate.

Punishment shall not, in any case, exceed Ten lashes with the strap, the number of lashes to be administered shall be determined by a Board of inquiry, consisting of at least two officials of the Arkansas State Penitentiary, The Superintendent or Assistant Superintendent, and the head Warden or an associate Warden. The Board of Inquiry will request that the accused inmate appear before the Board and speak in his own behalf. No Punishment will be administered in the field.

10. The straps used in Arkansas vary somewhat but all are similar. Each is of leather and from 3½ to 5½ feet in length, about 4 inches wide, and ¼ inch thick. Each has a wooden handle 8 to 12 inches long.

11. Since *Talley*, whippings are administered by wardens. The prisoner lies face down and the blows are to his buttocks. Supposedly, they are admin-

---

4. Some state statutes do. See, for example, 11 Delaware Code, §§ 631, 811, 3905, 3906, 3907, and 3908.

istered while the prisoner is fully clothed. Petitioners Ernst and Mask, however, testified without contradiction that they were required to lower their trousers and that they received lashes on the bare buttocks. There is corroborating and other evidence to the same effect with respect to other inmates and there was proof, some offered through the State Police, of deep bruises and bleeding.

12. Whipping is the primary disciplinary measure used in the Arkansas system. Prisioners there have few privileges which can be withheld from them as punishment. Facilities for segregation and solitary confinement are limited.

13. There is testimony that the strap hurts the inmate's pride, that it has been needed in order to preserve discipline, and that the work level improves after its administration. Contrarily, there is testimony that the whipping generates hate in the inmate who is whipped and that this hate flows toward the whipper, the institution and the system.

14. The circumstances relative to the punishment administered to the plaintiffs as well as to others and relative to various disciplinary matters are set forth in detail in the district court's opinion. 268 F.Supp. at 809–813. The testimony of James V. Bennett, former Director of the Federal Bureau of Prisons, and that of Fred T. Wilkinson, Director of the Department of Corrections of the State of Missouri (and former Deputy Director of the Federal Bureau of Prisons) are summarized in the district court's opinion. 268 F.Supp. at 813–814.

This testimony is to the effect that, among other things, corporal punishment has not been used for disciplinary purposes in federal prisons for years and that only Mississippi, in addition to Arkansas, uses it officially. Testifying as a penologist, it was Mr. Bennett's opinion that the whippings administered to the three plaintiffs were "cruel, degrading and certainly they were unusual in this day and age." Mr. Wilkinson testified that use of the strap "is cruel and unusual and unnecessary."

15. On July 20, 1966, six months after the issuance of the January 1966 regulations, plaintiff Ernst received two whippings of ten lashes each to the bare buttocks within a period of 45 minutes.

16. In August 1966 the Superintendent became aware of irregularities. An investigation disclosed violations of serious import. A number of wardens resigned or were discharged. The plaintiffs' cases were filed while this investigation was under way. The present Superintendent candidly does not seek to defend everything which has taken place.

17. The district judges concluded that the post-*Talley* rules and regulations of January 1966 still did not provide adequate safeguards. The use of the strap was therefore enjoined until further safeguards were provided. The court observed that more than one person's judgment should be required for a decision to administer corporal punishment.[5]

5. At oral argument we were advised that since the entry of the district court's decree other new rules and regulations have been adopted. These list the major offenses which "will warrant punishment." They recite that no inmate shall ever be authorized to inflict corporal punishment on another. Before punishment is imposed, a full hearing before a Board of Inquiry is required. The accusing warden may not sit on the Board of Inquiry or take part in carrying out the punishment. Punishment may include solitary confinement, reduction of rations, corporal punishment, loss of mail, recreation and other privileges, loss of future good time, and recording the offense for parole purposes. Corporal punishment shall not exceed ten lashes with the strap and a period in solitary confinement. In no case may the strap be applied to the bare buttocks. An accuser or other inmate shall not administer the strap. The strap shall not be used in the fields. No inmate shall be whipped within 24 hours of any preceding whipping. Each inmate sentenced to corporal punishment has the right of appeal to the superintendent or the assistant superintendent and this official or his designee may change the sentence. It

So much for the facts. Certain legal principles, which have general application here, are well established and admit of no real controversy:

■ 1. Lawful incarceration may properly operate to deprive the convict of certain rights which would otherwise be his to enjoy. Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). A classic example is Arkansas' denial to the felon of the right to vote. Ark.Const. art. 3, § 1 (as amended by Amendment No. 8); Ark. Stat.Ann. § 3–101 (Repl.1956); City of Newport v. Smith, 236 Ark. 626, 367 S.W.2d 742 (1963). Other states do the same. See, for instance, N.D.Const. art. V, § 127, N.D.Cent.Code § 16–01–04 (1960), and State ex rel. Olson v. Langer, 65 N.D. 68, 256 N.W. 377 (1934); Mo. Const. art. VIII § 2, VAMS § 111.060 (1966), and State ex rel. Barrett v. Sartorious, 351 Mo. 1237, 175 S.W.2d 787, 789–790, 149 A.L.R. 1067 (1943); Minn.Const. art. 7, § 2.

■ 2. The only federal restraint to state action of this kind lies in the Constitution and in the statutes in enforcement thereof, specifically, the Fourteenth Amendment's equal protection and due process clauses, and the Fifteenth Amendment's proscription of the denial to citizens of the United States of the right to vote "on account of race, color, or previous condition of servitude." Katzenbach v. Morgan, 384 U.S. 641, 647, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966); Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); Carrington v. Rash, 380 U.S. 89, 91, 85 S.Ct. 775, 13 L. Ed.2d 675 (1965); State ex rel. Olson v. Langer, supra, 256 N.W. at 385–386. But previous criminal record has been referred to as among the "obvious examples indicating factors which a State may take into consideration in determining the qualifications of voters." Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45, 51, 79 S.Ct. 985, 990, 3 L.Ed.2d 1072 (1959); Davis v. Beason, 133 U.S. 333, 346–347, 10 S.Ct. 299, 33 L.Ed. 637 (1890).

■ 3. On the other hand, a prisoner of the state does not lose all his civil rights during and because of his incarceration. In particular, he continues to be protected by the due process and equal protection clauses which follow him through the prison doors. Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L. Ed.2d 1030 (1964); Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941).

■ 4. Despite earlier comments to the contrary, see, for example, In re Kemmler, 136 U.S. 436, 446, 10 S.Ct. 930, 34 L.Ed. 519 (1890); O'Neil v. Vermont, 144 U.S. 323, 332, 12 S.Ct. 693, 36 L.Ed. 450 (1892); and Collins v. Johnston, 237 U.S. 502, 510–511, 35 S.Ct. 649, 59 L.Ed. 1071 (1915), the Eighth Amendment's guarantee against the infliction of cruel and unusual punishments seems now to have come to be regarded as directly applicable to the states through the due process clause of the Fourteenth Amendment. Robinson v. California, 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), and Mr. Justice Douglas in concurrence at 675, 82 S.Ct. 1417; Wright v. McMann, 387 F.2d 519, 522 (2 Cir. 1967). See State of La. ex rel. Francis v. Resweber, 329 U.S. 459, 463, 67 S.Ct. 374, 91 L.Ed. 422 (1947) and Powell v. Texas, 392 U.S. 514, 531–532, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968).

---

is stated that corporal punishment is not deemed necessary at Tucker because the inmates are youthful first offenders.

We were also advised that at a meeting of the Board held February 29, 1968, with all members in attendance, a resolution was adopted that corporal punishment in any form "be abolished as a means of discipline in the institution."

These changes, of course, do not render the present appeal moot. United States v. W. T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed.2d 1303 (1953); Gray v. Sanders, 372 U.S. 368, 376, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); Morris v. Williams, 149 F.2d 703, 708–709 (8 Cir. 1945).

5. The federal courts, including this one, entertain a natural reluctance to interfere with a prison's internal discipline. This is true with respect to federal institutions, Glenn v. Ciccone, 370 F.2d 361, 363 (8 Cir. 1966); Sutton v. Settle, 302 F.2d 286, 288 (8 Cir. 1962), cert. denied, 372 U.S. 930, 83 S.Ct. 876, 9 L.Ed.2d 734; Garcia v. Steele, 193 F.2d 276, 278 (8 Cir. 1951), see Holland v. Ciccone, 386 F.2d 825 (8 Cir. 1967), cert. denied, 390 U.S. 1045, 88 S.Ct. 1646, 20 L.Ed.2d 307, as well as to state prisons, Douglas v. Sigler, 386 F.2d 684, 688 (8 Cir. 1967); Lee v. Tahash, 352 F. 2d 970, 971 (8 Cir. 1965); Wright v. McMann, supra, 387 F.2d at 522.

6. However, the courts, including this one, have not hesitated to entertain petitions asserting violations of fundamental rights and, where indicated, to grant relief. In Glenn v. Ciccone, which we have just cited, this court clearly indicated that "a factual showing of cruel and unusual punishment in violation of the Eighth Amendment" would support interference by a federal court. 370 F. 2d at 363. We have made a like statement in many other cases. Carey v. Settle, 351 F.2d 483, 485 (8 Cir. 1965); Haynes v. Harris, 344 F.2d 463, 466 (8 Cir. 1965); Harris v. Settle, 322 F.2d 908, 910 (8 Cir. 1963), cert. denied, 377 U.S. 910, 84 S.Ct. 1171, 12 L.Ed.2d 179. Although the Eighth Circuit cases just cited concern a federal institution, the principle, of course, has equal application to a state penitentiary. Wright v. McMann, supra, 387 F.2d at 522; Howard v. Smyth, 365 F.2d 428 (4 Cir. 1966), cert. denied, 385 U.S. 988, 87 S.Ct. 599, 17 L.Ed.2d 449.

This takes us then to a consideration of the meaning and scope of the Eighth Amendment's proscription of the infliction of "cruel and unusual punishments." The phrase appeared in the English Bill of Rights of December 16, 1689, 1 W. and M. s.2, c.2 but seems to have had still earlier antecedents in Magna Charta and elsewhere. IV Blackstone, Commentaries, 379.

The Supreme Court long ago acknowledged, "Difficulty would attend the effort to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishment shall be inflicted * * *." Wilkerson v. Utah, 99 U.S. 130, 135–136, 25 L.Ed. 345 (1878). This difficulty, and the absence of an exact or exhaustive definition of the Amendment's ban, has been repeatedly noted. In re Kemmler, supra, 136 U.S. at 447, 10 S.Ct. 930; Weems v. United States, 217 U.S. 349, 368–371, 30 S.Ct. 544, 54 L.Ed. 793 (1910); Trop v. Dulles, 356 U.S. 86, 87, 99, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).

There are, however, indications, by specific holdings and other observations, which bear upon the extent and reach of the Eighth Amendment's proscription. Thus in Wilkerson v. Utah, execution by public shooting, and in In re Kemmler, execution by electrocution, were classified as outside the ban. But in *Wilkerson*, 99 U.S. at 136, the Court observed "it is safe to affirm that punishments of torture * * * and all others in the same line of unnecessary cruelty, are forbidden * * *" In *Kemmler*, 136 U.S. at 446–447, 10 S.Ct. at 933, the Court describes, as within the constitutional prohibition, punishments which are "manifestly cruel and unusual, as burning at the stake, crucifixion, breaking on the wheel, or the like" and, as cruel, those which "involve torture or a lingering death." And it said that the word "cruel," as used in the Eighth Amendment, "implies there something inhuman and barbarous,—something more than the mere extinguishment of life." 136 U.S. at 447, 10 S.Ct. at 933. In O'Neil v. Vermont, supra, 144 U.S. at 339–340, and 364, 12 S.Ct. 693, Mr. Justice Field, in dissent (joined by Justices Harlan and Brewer, 144 U.S. at 370–371, 12 S.Ct. 693), advanced the thought that the Amendment's "inhibition is directed, not only against punishments of the character mentioned, but against all punishments which by their excessive length or severity are greatly disproportioned to the offenses

charged." He went on to say that although a state has the power to whip for petty offenses, "repulsive as such mode of punishment is," the increase of such punishment by accumulation for multiple offenses could be both unusual and cruel. 144 U.S. at 340, 12 S.Ct. at 699.

In Weems v. United States, supra, the Court observed, 217 U.S. at 373, 30 S. Ct. at 551, that "a principle, to be vital, must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions." The majority condemned a Philippine statute on the ground that the disparity between the punishment it imposed (cadena temporal for 15 years, that is, among other things, "hard and painful labor," with a chain at the ankle, hanging from the wrists, and with outside assistance denied) for a false entry in a public record and that imposed for more serious crimes made it repugnant to the Philippine Bill of Rights forbidding cruel and unusual punishment.

In State of La. ex rel. Francis v. Resweber, supra, 329 U.S. at 463, 67 S.Ct. at 376, the Court spoke of the "traditional humanity of modern Anglo-American law" and "unnecessary pain" and the "wanton infliction of pain," and the dissent referred, at page 473, 67 S. Ct. at 381, to that which "shocks the most fundamental instincts of civilized man." Mr. Justice Douglas, concurring, in Robinson v. California, supra, 370 U.S. at 676, 82 S.Ct. at 1425, said, "The Eighth Amendment expresses the revulsion of civilized man against barbarous acts—the 'cry of horror' against man's inhumanity to his fellow man." In Rudolph v. Alabama, 375 U.S. 889, 84 S.Ct. 155, 11 L.Ed.2d 119 (1963), three dissenters to the denial of certiorari spoke of "standards of decency more or less universally accepted," of disproportion between offense and punishment, and of "unnecessary cruelty." In Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 223, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968), Mr. Justice Douglas, in dissent, referred to the historical fact (noted by

Mr. Justice Harlan, in dissent, in Duncan v. Louisiana, 391 U.S. 145, 191–192, 88 S.Ct. 1444, 20 L.Ed.2d 491, 522 (1968)) that petty offenses once entailed whipping as punishments, but said, "I am loath to hold whippings * * * as 'petty.'"

This court has added its word. It has described the situation where a court will interfere with prison discipline as one "of such character or consequence as to shock general conscience or to be intolerable in fundamental fairness, and so to amount to illegal administration of prison sentence." Carey v. Settle, supra, 351 F.2d at 485. Judge Johnsen there went on to say that it is possible for the form or extent of institutional treatment to offend the Eighth Amendment. In a later case concerning a state prisoner, Judge Johnsen repeated these observations and said,

"Such treatment is entitled to be held to be within the ban of the Eighth Amendment as representing cruel and unusual punishment and so constituting unlawful administration of prison sentence. It may be observed in this connection that penal admeasurements made by general conscience and sense of fundamental fairness doubtless will not be without some relationship to the humane concepts and reactions of present-day social climate." Lee v. Tahash, supra, 352 F.2d at 972.

The principal opinion in Trop v. Dulles, supra, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed. 2d 630 (1958), although it commanded the votes of only four justices a decade ago, is, in our view, practically pertinent. The issue was the validity of a federal statute which would denationalize a native born citizen who deserts the military service in time of war and is convicted thereof by a court-martial and dismissed or dishonorably discharged. The opinion provides guidelines and overtones which we feel safe in regarding as illustrative of the general thinking of a majority of the justices on the subject today. The opinion casts aside the death penalty "as an index of the con-

stitutional limit on punishment," for it "has been employed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty." 356 U.S. at 99, 78 S.Ct. at 597. The Eighth Amendment's basic concept "is nothing less than the dignity of man" and assures that a state's punishment power "be exercised within the limits of civilized standards." Fines, imprisonment, and even execution may be imposed "but any technique outside the bounds of these traditional penalties is constitutionally suspect." 356 U.S. at 100, 78 S.Ct. at 598. The scope of the Amendment is not "static." It "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." 356 U.S. at 102, 78 S.Ct. at 598. Virtually all the world's civilized nations refuse to impose statelessness as punishment for crime. 356 U.S. at 102, 78 S.Ct. at 598.

From that opinion we glean a recognition of, and a reliance in part upon, attitudes of contemporary society and comparative law. And the emphasis is on man's basic dignity, on civilized precepts, and on flexibility and improvement in standards of decency as society progresses and matures. Finally, it is "any technique" outside the traditional bounds which "is constitutionally suspect."

■ In summary, then, so far as the Supreme Court cases are concerned, we have a flat recognition that the limits of the Eighth Amendment's proscription are not easily or exactly defined, and we also have clear indications that the applicable standards are flexible, that disproportion, both among punishments and between punishment and crime, is a factor to be considered, and that broad and idealistic concepts of dignity, civilized standards, humanity, and decency are useful and usable. We recognize that some of these utterances by the Court were made in concurrence or dissent or in the approach, evidently now superseded, through the Fourteenth Amendment's due process clause rather than jointly through the Fourteenth and Eighth Amendments. All this, however, strikes us as of no import because we read and ascertain in the totality of the language used the basic attitude of the entire Court to the Eighth Amendment.

■ With these principles and guidelines before us, we have no difficulty in reaching the conclusion that the use of the strap in the penitentiaries of Arkansas is punishment which, in this last third of the 20th century, runs afoul of the Eighth Amendment; that the strap's use, irrespective of any precautionary conditions which may be imposed, offends contemporary concepts of decency and human dignity and precepts of civilization which we profess to possess; and that it also violates those standards of good conscience and fundamental fairness enunciated by this court in the *Carey* and *Lee* cases.

Our reasons for this conclusion include the following: (1) We are not convinced that any rule or regulation as to the use of the strap, however seriously or sincerely conceived and drawn, will successfully prevent abuse. The present record discloses misinterpretation and obvious overnarrow interpretation even of the newly adopted January 1966 rules. (2) Rules in this area seem often to go unobserved. Despite the January 1966 requirement that no inmate was to inflict punishment on another, the record is replete with instances where this very thing took place. (3) Regulations are easily circumvented. Although it was a long-standing requirement that a whipping was to be administered only when the prisoner was fully clothed, this record discloses instances of whippings upon the bare buttocks, and with consequent injury. (4) Corporal punishment is easily subject to abuse in the hands of the sadistic and the unscrupulous. (5) Where power to punish is granted to persons in lower levels of administrative authority, there is an inherent and natural difficulty in enforcing the limitations of that power. (6) There can be no argument that excessive whipping or an inappropriate manner of whipping or too great frequency of whipping or the

use of studded or overlong straps all constitute cruel and unusual punishment. But if whipping were to be authorized, how does one, or any court, ascertain the point which would distinguish the permissible from that which is cruel and unusual? (7) Corporal punishment generates hate toward the keepers who punish and toward the system which permits it. It is degrading to the punisher and to the punished alike. It frustrates correctional and rehabilitative goals. This record cries out with testimony to this effect from the expert penologists, from the inmates and from their keepers. (8) Whipping creates other penological problems and makes adjustment to society more difficult. (9) Public opinion is obviously adverse. Counsel concede that only two states still permit the use of the strap. Thus almost uniformly has it been abolished. It has been expressly outlawed by statute in a number of states. See for example, N.D.Cent. Code § 12–47–26 (1960); S.D.Code § 13.4715 (1939). And 48 states, including Arkansas, have constitutional provisions against cruel or unusual punishment. Ark.Const. art. 2, § 9.

We are not convinced contrarily by any suggestion that the State needs this tool for disciplinary purposes and is too poor to provide other accepted means of prisoner regulation. Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations or by the thickness of the prisoner's clothing.

Although their fact situations are somewhat different, we regard the following cases as helpfully significant in this area: Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966); Landman v. Peyton, 370 F.2d 135, 139–141 (4 Cir. 1966), cert. denied, 388 U.S. 920, 87 S. Ct. 2142, 18 L.Ed.2d 1367; Fulwood v. Clemmer, 206 F.Supp. 370, 379 (D.D.C. 1962); Wright v. McMann, supra, 387 F.2d 519, 525–526 (2 Cir. 1967); Johnson v. Dye, 175 F.2d 250, 255–256 (3 Cir. 1949), rev'd on procedural grounds, 338 U.S. 864, 70 S.Ct. 146, 94 L.Ed. 530;

Harper v. Wall, 85 F.Supp. 783 (D.N.J. 1949); Application of Middlebrooks, 88 F.Supp. 943, 951–952 (S.D.Cal.1950), rev'd on procedural grounds, 188 F.2d 308 (9 Cir. 1951), cert. denied, 342 U.S. 862, 72 S.Ct. 90, 96 L.Ed. 649; Siegel v. Ragen, 88 F.Supp. 996, 999 (N.D.Ill. 1949), aff'd, 180 F.2d 785 (7 Cir. 1950), cert. denied, 339 U.S. 990, 70 S.Ct. 1015, 94 L.Ed. 1391; Sweeney v. Woodall, 344 U.S. 86, 91–93, 73 S.Ct. 139, 97 L. Ed. 114 (1952) (Douglas J., in dissent to a reversal on procedural grounds). See Kostal v. Tinsley, 337 F.2d 845, 846 (10 Cir. 1964), cert. denied, 380 U.S. 985, 85 S.Ct. 1354, 14 L.Ed.2d 277.

There is authority, some of it recent, with seemingly contrary indications. Certain of these cases rest on the presence of specific statutory provision for corporal punishment for crime. State v. Revis, 193 N.C. 192, 136 S.E. 346, 50 A.L.R. 98 (1927); Westbrook v. State, 133 Ga. 578, 66 S.E. 788 (1909); State v. Cannon, 190 A.2d 514, 518–519 (Del. Sup.1963); Balser v. State, 195 A.2d 757, 758 (Del.Sup.1963); Cannon v. State, 196 A.2d 399, 400 (Del.Sup.1963); United States v. Jones, 108 F.Supp. 266, 270 (S.D.Fla.1952), rev'd on other grounds 207 F.2d 785 (5 Cir. 1953). See 18 C.J.S. Convicts § 11 (1939) and 41 Am.Jur., Prisons and Prisoners, § 37 (1942).

We choose to draw no significant distinction between the word "cruel" and the word "unusual" in the Eighth Amendment. See Trop v. Dulles, supra, 356 U.S. at 100 n. 32, 78 S.Ct. 590. We would not wish to place ourselves in the position of condoning punishment which is shown to be only "cruel" but not "unusual" or vice versa. In any event, the testimony of the two expert penologists clearly demonstrates that the use of the strap in this day is unusual and we encounter no difficulty in holding that its use is cruel.

■ Neither do we wish to draw, in this context, any meaningful distinction between punishment by way of sentence statutorily prescribed and punishment

imposed for prison disciplinary purposes. It seems to us that the Eighth Amendment's proscription has application to both.

The district court's decree is vacated and the case is remanded with directions to enter a new decree embracing the injunctive relief heretofore granted but, in addition, restraining the Superintendent of the Arkansas State Penitentiary and all personnel of the penitentiary system from inflicting corporal punishment, including the use of the strap, as a disciplinary measure.