Charles McCoy SHEARIN, Plaintiff,

v.

CORRECTION OFFICER E.W.
PENNINGTON, et al.,
Defendants.

Civ. A. No. 2:93cv568.

United States District Court,
E.D. Virginia,
Norfolk Division.

July 26, 1994.

---

Charles McCoy Shearin, pro se.

Susan C. Alexander, Asst. Atty. Gen. of Virginia, p.d., Richmond, VA, for defendants.

## FINAL ORDER

REBECCA BEACH SMITH, District Judge.

Plaintiff, a Virginia inmate, brought this *pro se* action, pursuant to 42 U.S.C. § 1983, to redress alleged violations of his constitutional rights. By Opinion and Order filed January 5, 1994, this matter was referred to a United States Magistrate Judge to conduct an evidentiary hearing and to submit findings of fact and recommendations for disposition of the case. Subsequent to the Opinion and Order, defendants filed dispositive motions and conducted some discovery. A hearing was conducted on May 18, 1994.

On June 23, 1994, the magistrate judge filed a Report and Recommendation recommending that plaintiff's motion for summary judgment be denied, and defendants' motion for summary judgment be granted.

By copy of the report and recommendation of the magistrate judge, the parties were advised of their right to file written objections thereto. The court has received no objections to the magistrate judge's report and recommendation, and the time for filing same has expired.

The court does hereby adopt and approve in full the findings and recommendations set forth in the Report and Recommendation of the United States Magistrate Judge filed June 23, 1994. Accordingly, it is ORDERED that plaintiff's motion for summary judgment be granted.

Plaintiff is advised that he may appeal *in forma pauperis* from this final order by forwarding a written notice of appeal to the Clerk of the United States District Court, United States Courthouse, Granby Street, Norfolk, Virginia 23510, which said written notice must be received by the Clerk within thirty (30) days of the date of this Order and may be filed without the prepayment of costs or the giving of security therefor.

The Clerk shall forward a copy of this Final Order to plaintiff and to counsel for defendants.

It is so ORDERED.

Filed June 23, 1994.

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

BRADBERRY, United States Magistrate Judge.

Plaintiff, a Virginia inmate, has brought this *pro se* action pursuant to 42 U.S.C. § 1983 to address the alleged violation of constitutional rights accorded him under the Eighth Amendment of the United States Constitution. The complaint alleges that Corrections Officer E.W. Pennington committed an assault and battery against his person, and other corrections employees failed to protect him, thereby subjecting him to cruel and unusual punishment.

The matter was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 29 of the Rules of the United States District Court for the Eastern District of Virginia, to conduct an evidentiary hearing and submit findings of fact and recommendations for disposition of the case.

## I. STATEMENT OF THE CASE

### A. Background

On June 2, 1993, the plaintiff conditionally filed a complaint under 42 U.S.C. § 1983 for violation of his civil rights. The complaint alleged that on April 27, 1993, while confined at Powhatan Correctional Facility Corrections Officer E.W. Pennington (1) committed an unlawful assault and battery upon plaintiff, and (2) immediately following the assault, Lt. Richard W. Rowlette placed the plaintiff on "strip cell status" for six days without according plaintiff due process and a disciplinary hearing.

Upon payment of a partial filing fee, the complaint was formally filed on August 17, 1993, and defendants were ordered to file responsive pleadings.

The answer was received on September 1, 1993.

On September 24, 1993, plaintiff filed a motion to amend the complaint by adding charges of misconduct by corrections officials on August 8, 1993, when, following an altercation with guards, plaintiff was placed on strip cell status for three days and thereafter sentenced to fifteen days in isolation.

On September 24, 1993, plaintiff filed a request for trial by jury.

On September 30, 1993, defendants, by counsel, filed a motion for summary judgment and accompanied the motion with the affidavits of defendants Pennington and Rowlette; Corrections Officer A.C. Smith; prison physician Muhammad Sarker; and prisoner hearing officer Janet Bain.

Plaintiff filed a response to the defendants' motion, together with his own motion for summary judgment, accompanied by affidavits of inmates Walter Jeffries, Freddie Ferrell, Anthony C. McGaha, Henry Gorum, Gerald F. McNabb, Lonnie Gholson, and Christopher E. Cockrell.

No response was ever filed to plaintiff's motion to amend.

On January 5, 1994, the District Court entered an order denying plaintiff's motion to amend or supplement his complaint; denying plaintiff's request for trial by jury, demand having been made in an untimely fashion; denying plaintiff's motion for summary judgment; and granting defendants' motion for summary judgment as to Count II of the complaint. Defendants' motion for summary judgment as to Count I of the complaint, alleging that corrections officials used excessive force against the plaintiff and committed an assault and battery upon his person, was denied, and the matter was referred to this Court for a hearing.

After addressing some minor scheduling problems, arising as a result of the unavailability of a witness who was outside of the continental United States for an extended period of time, the matter was set down for hearing on May 18, 1994.

On the appointed date, the matter came on for hearing.

## B. Facts

On April 27, 1993, plaintiff was an inmate in the Virginia Department of Corrections and assigned to Powhatan Correctional facility, where he was housed in the maximum security portion of the prison. (Tr. at 13, 24.) On that date, plaintiff was the sole inmate in a "strip cell" which consisted of a cell containing a single bunk. (Tr. at 24.) The evidence does not reflect whether plaintiff's cell contained a commode. However, the plaintiff had no containers, personal effects, or utensils in the cell. (Tr. at 24.)

On the same morning, defendant E.W. Pennington was working in M Building where plaintiff was housed. (Tr. at 24, 58, 73, 86.) The plaintiff states that Pennington came to the building twice in the morning for the purpose of harassing him. (Tr. at 24.) The plaintiff is white, and Pennington is African American. Plaintiff claims that the harassment consisted of threats and racial slurs directed at him as a white male. (Tr. at 24.) After leaving the second time for reasons unknown, Pennington returned a third time and began the process of opening ventilation windows near the top of a wall. (Tr. at 30, 59, 73.) On that morning, another inmate had become disruptive, hurling human waste and feces at corrections officers from his cell. His conduct had continued for some time, and much of the waste was on the floor and walls adjacent to his cell and created a stench throughout the cell block. (Tr. at 72.) In order to better ventilate the cell block, Pennington, using a long metal window rod, started to open the windows at the top of the wall. (Tr. at 59, 73.) The rod has been described by inmate Walter Jeffries as fifteen feet long, and by Pennington as a "long" rod. (Tr. at 20, 59.)

While he was so engaged, plaintiff threw liquid waste, consisting of feces which had been dissolved, on Pennington, covering him from his head to his knees. The people who saw him after the assault uniformly described him as covered with excrement. (Tr. at 15, 61, 86.) Plaintiff has admitted that he threw the waste material on the officer and said he did so because Pennington had harassed and threatened him as a result of an altercation on the prison recreation yard in-

volving the plaintiff and Pennington the day before, April 26, 1993. (Tr. at 24, 25, 47.) The willful nature of the act is reflected in the fact that plaintiff had no containers in which such material could be held and used to hurl the material on Pennington. Instead, plaintiff obtained the material from a prisoner in an adjacent cell who was not in a "strip" status. (Tr. at 25.)

Following the attack, Pennington took the window rod and placed it through the bars of plaintiff's cell. Plaintiff says that Pennington came at him with the window rod charging towards the cell bars and pushing the rod violently into him, injuring him in his abdomen or chest. (Tr. at 25.) He said he crouched down behind the bed in an effort to hide from Pennington. (Tr. at 25.) The officer, on the other hand, said that while he did put the rod through the bars and under the bed, he did so to keep the plaintiff from acquiring more feces which he, Pennington, feared was to be thrown on him. (Tr. at 59, 74, 75, 88.)

The events are essentially corroborated, although not in every detail, by inmates Walter Jeffries, Anthony Charles McGaha, and Freddie Lewis Ferrell, and by Officer Smith who was on the cell block at the same time. (Tr. at 14–15, 19; 30–31, 34; 42; 86–88.)

Jeffries, who was a few cells away from the plaintiff and could not see the cell, described Pennington as having feces on his head, back, and other parts of his body and described him as "highly upset." (Tr. at 15.)

Inmate Anthony McGaha testified that during this time he talked to the plaintiff, using a mirror as a means of supplementing communications. (Tr. at 30–31.) He was the inmate who had requested that the windows be opened. McGaha said something was thrown on Pennington's face but conveniently claimed not to know who had thrown the material. (Tr. at 32.) He described Pennington as upset and stated that the officer jabbed the window rod into plaintiff's cell. He claimed to see the officer poking the rod in the vicinity of plaintiff's torso. (Tr. at 34.) He also claims to have heard the metal rod hitting the bed in plaintiff's cell.

Freddie Ferrell denied knowing where the feces had come from or who had thrown the feces on Pennington. He also saw the officer stick the rod in the cell and heard plaintiff yell for help. (Tr. at 42–43.)

A fourth inmate, Gerald McNabb, was called and testified that he had seen feces thrown on a number of occasions, but his testimony was not related to any specific events on April 27, 1993. However, when asked by plaintiff, McNabb indicated that in general he had no trouble or difficulties with Pennington. (Tr. at 44–45.)

Pennington was called as a witness for the plaintiff. When asked by the plaintiff why he did what he did, Pennington replied "I reacted," (Tr. at 60–61), further explaining that he was attempting to avoid being hit with additional feces which he thought the plaintiff was trying to retrieve from under the bed. (Tr. at 59.) Pennington was recalled to the witness stand by his own counsel and testified that on April 26, 1993, the day before, he had written up the plaintiff for two violations (refusing an order and indecent exposure) and that after receiving notice of the violations, plaintiff told Pennington that he would no longer be able to work in M Building. (Tr. at 71–72.)

Pennington further explained the problem with the first inmate who threw waste and the steps taken to deal with the problem. (Tr. at 72.) He said that he was opening the windows because of the stench; when he felt the material hit him, he turned around and saw the plaintiff under the bed. (Tr. at 59, 73–74.) After throwing the waste, Pennington said plaintiff threatened to kill him. (Tr. at 76.) Pennington said that Smith pulled him back from the cell and sent him off to clean himself up. (Tr. at 77.)

Officer Smith confirmed the testimony of Pennington. He described Pennington getting hit and said that Pennington was covered from head to toe with feces. After Pennington ran the window rod into the cell, Smith ran to Pennington, grabbed the rod, and pulled Pennington back. Pennington was visibly upset. When Smith arrived at the cell plaintiff was getting up. Smith said that Pennington never did get the window rod all the way into the cell. (Tr. at 86–89.)

Following the incident, which was reported to higher ranking corrections officials, plaintiff complained of pain in his abdomen and chest as a result of being struck with the window rod. (Tr. at 25.) Defendant Rowlette came to the plaintiff's cell, having been advised of the incident, and was told by the plaintiff that he was hurt and needed medical attention. (Tr. at 90.) Rowlette summoned two additional corrections officers who placed plaintiff in handcuffs (behind his back). (Tr. at 93.) There is a question about whether the plaintiff was also placed in leg irons. On a prior occasion, as part of an administrative hearing, Rowlette wrote a statement indicating that the plaintiff was placed in leg irons. His testimony, during the hearing, contradicted the previous written statement. When asked, by plaintiff, he replied that he did not have a recollection of having previously made that statement and that to the best of his recollection leg irons were not used. (Tr. at 115–16.)

Inmate McGaha told the plaintiff not to leave his cell. When asked why, he responded that he thought the guards were going to try to retaliate against plaintiff in some manner. (Tr. at 38.)

The plaintiff was taken from his cell to be medically examined. Inmate Jeffries said it appeared that the plaintiff was in pain. He observed the plaintiff who had to pass by his cell to go to the infirmary. (Tr. at 18–19.)

Rowlette, accompanied by Corrections Officers Brown and Palmer, moved the plaintiff out of his cell and took him to the infirmary. (Tr. at 64, 65.) Rowlette described plaintiff's appearance when he arrived at the cell. He had on no shirt and his stomach was perfectly white. His stomach, torso, and chest reflected no apparent evidence of impact with any kind of rod, blunt instrument, or pole. (Tr. at 90.)

With Rowlette leading and Palmer and Brown following, holding on to the plaintiff, the group moved out of the cell block and down a flight of stairs leading past the kitchen. About the time they got to the stairs, Pennington came out of the kitchen where he had been cleaning himself. Pennington saw the plaintiff and immediately bolted towards

the plaintiff, attempting to leap over Rowlette in order to get to the plaintiff. Rowlette testified that Pennington's arms were swinging and that he looked like a "duck trying to take off." (Tr. at 65.) Rowlette was able to block Pennington and was himself hit in the attempt. (Tr. at 66.) Rowlette, Pennington, and Corrections Officer Sergeant Nathaniel Laury, who was also assisting in the movement of the prisoner, all testified that Pennington never made contact with the plaintiff. (Tr. at 66, 83, 96.)

In addressing the second confrontation, Jeffries said he heard a commotion down the hall and heard the plaintiff say "keep him away from me" or "get him off of me." Jeffries, however, was unable to see what occurred and has no personal knowledge. (Tr. at 20.)

Plaintiff was taken directly to the infirmary where he was examined by Dr. Muhammad Sarker, the prison doctor. Upon arrival at the infirmary, plaintiff complained of neck and chest pains but did not complain that he had been hit in the abdomen or chest with a rod. Dr. Sarker testified, in response to direct questions by the Court, that plaintiff displayed no physical evidence whatsoever of bruising on his chest or abdomen that was consistent with plaintiff being hit with a rod, pole, or blunt ended metal object with any force. (Tr. at 101.) Dr. Sarker was aware of the fact that the plaintiff had been seen in the prison infirmary on the day before, April 26, 1993, (Tr. at 103, 104), following an altercation in which several corrections officers were needed to subdue the plaintiff and return him from the recreation yard to his cell. In the course of that altercation, plaintiff was sprayed with mace, (Tr. at 104), hit with a riot shield, placed forcibly on the ground on his face, handcuffed from behind, and manacled in leg restraints. (Tr. at 107.)

Corrections Officer David Lee Widener testified about the altercation which occurred in the recreation yard on April 26, 1993. The Court takes note of the fact that Widener is a physically big man and an imposing presence. He testified that he was one of the four officers who helped to subdue the plaintiff, and that he personally hit the plaintiff in the face and chest area with a heavy protective shield as a part of the direct effort to forcibly place the plaintiff on the ground and apply restraints to him.

Dr. Sarker found some tenderness in plaintiff's neck and upper chest but testified that the tenderness could have been present for several days. (Tr. at 101, 105). X-rays were ordered, but there is no evidence that the x-rays revealed injury of any type.

It is also appropriate to consider the unrebutted testimony of Rowlette regarding plaintiff's claim of injury:

> I had him placed in a holding cell, and I informed the nurse what had happened, and the major what had happened, and had a nurse come back and told her specifically, "Check him because he claimed he had been assaulted." He also claimed when Pennington was charging towards him, he claimed that Officer Palmer pulled him. He was caught from behind. And he claimed Officer Palmer pulled him back and it snapped his neck back. And he said now his neck hurt.
>
> He never at any time claimed Pennington had hit him. He claimed that his neck was injured by Palmer pulling him back. So he wanted to be seen for the window rod hitting him in the stomach, he claimed, and his neck was hurting because he said Palmer pulled him by the cuff and snapped his neck back.

(Tr. at 92.)

In an attempt at rebuttal, plaintiff called to the witness stand Erwin H. Beckoff, a psychologist at the Haynesville Correctional Center who had previously treated the plaintiff. Beckoff remembered the plaintiff from contacts he had had with plaintiff when plaintiff was in isolation at the Augusta Correctional Center. (Tr. at 113.) When asked by the plaintiff whether he recalled the plaintiff complaining of flash-backs and claims of emotional trauma as a result of the assault by Pennington, Beckoff responded that he had absolutely no recollection of any such conversations. (Tr. at 113.) In response to questions propounded by the Court, Beckoff indicated that the plaintiff had never contacted him prior to the hearing and he had no

idea of why he had been called as a witness. (Tr. at 113.)

### C. Issues

1. Was the plaintiff subjected to the use of excessive force by corrections officers at Powhatan Correctional facility?

2. As a result of the use of force by corrections officers at Powhatan Correctional facility, was plaintiff injured on April 27, 1993?

3. Were plaintiff's Eighth Amendment rights violated on April 27, 1993?

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Plaintiff was Not Subjected to the Use of Excessive Force.

■ The record reveals that on the day preceding the events of April 27, 1993, plaintiff and Pennington had been involved in an altercation in the recreation yard of Powhatan Correctional Center. The plaintiff declined to leave the yard and return to his cell and required the physical efforts of four corrections officers to subdue him and return him to the cell block. Plaintiff accused Pennington of striking him with a stick during that incident.

Accepting plaintiff's testimony at face value, though it was not corroborated by other witnesses, Pennington engaged in verbal harassment on two separate occasions during the early morning of April 27, 1993, prior to returning to open the ventilation windows in the cell block. What the defendant did not do was direct against the plaintiff any force. Plaintiff was not hit in the head with a baton or thrown forcibly to the floor, *Highsmith v. Pulley,* 1991 WL 110360, 1991 U.S.App. LEXIS 13108 (4th Cir.1991); nor was he struck with a kubotan [1], *Grimsley v. Luttrell,* 1993 WL 53150, 1993 U.S.App. LEXIS 4525 (4th Cir.1993); nor did a jailer swing a set of keys on a brass ring at his face, *Norman v. Taylor,* 9 F.3d 1078 (4th Cir.1993), *vacated* (1994); nor was he sprayed with high-pressure fire hoses, *Campbell v. Grammer,* 889

F.2d 797, 802 (8th Cir.1989); subjected to electric shock, *Jackson v. Bishop,* 404 F.2d 571, 574–75 (8th Cir.1968); or flogged. *Id.* At best, and if believed, Pennington verbally provoked the plaintiff.

The plaintiff, on the other hand, assaulted Pennington. His conduct was intentional, as evidenced by his requisition of liquid waste from a prisoner in an adjoining cell, and according to his own testimony was carefully calculated. The numbers of people privy to the events inside the cell block established that in his retaliatory efforts, plaintiff was highly successful: the defendant was covered with human waste from head to knee.

The response of the defendant was no more than might have reasonably been expected considering the personal degradation inherent in the assault.

Twenty years ago, Judge Friendly, speaking for the Second Circuit, noted:

> Although "the least touching of another in anger is a battery," it is not a violation of a constitutional right actionable under 42 U.S.C. § 1983.... Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights. In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973) (citation omitted), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

Judge Friendly has been favorably quoted in *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Whitley v. Albers,* 475 U.S. 312, 320–21, 106 S.Ct. 1078, 1084–85, 89 L.Ed.2d 251 (1986); *Miller v. Leathers,* 913 F.2d 1085, 1090 (4th Cir.1990),

---

1. A kubotan is a miniature billy club with an attached ring designed to subdue inmates by inflicting pain.

*cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). Thus the question becomes whether the force applied by Pennington was applied "in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at ——, 112 S.Ct. at 999, 117 L.Ed.2d at 166.

Pennington acknowledged his anger following the assault and further acknowledged that he thrust the window rod through the bars of the cell in the direction that plaintiff was located. The defendant claims that he was attempting to prevent the plaintiff from acquiring additional material to throw upon him; plaintiff says that he was hiding under the bed in order to escape the efforts of Pennington to thrust the pole at him. In either event, Pennington had been assaulted, perceived the risk of an additional assault, and took prompt and immediate steps, including physical action, to prevent plaintiff from continuing his disruptive and assaultive behavior. In the context of Pennington's knowledge of the events of the day before, including the fact that four officers were required to subdue plaintiff, it would be difficult to describe his response as "excessive." (Tr. at 107–08.)

The testimony presented by the plaintiff, as well as that offered by the defendant, suggests that the incident was over very quickly, having been brought to a prompt conclusion by the intervention of Smith who pulled Pennington away and sent him out of the cell block.

The second part of the excessive force claim arises from the allegation of the plaintiff that Pennington attacked him while he was in a handcuffed and shackled status and being conveyed to the infirmary for an examination.

Rowlette testified that he received the blows which were intended for the plaintiff when he stepped between a charging Pennington and the plaintiff. Laury confirmed the testimony of Rowlette that Pennington never made contact with the plaintiff. Finally, Pennington, who was called by the plaintiff and testified in his own behalf, consistently, stated that he was angry and upset and went after the plaintiff but never reached him, his intended blows instead striking Rowlette.

None of the prison inmates saw the second incident and were dependent upon self-serving declarations of the plaintiff.

The Court finds from the evidence that following the intervention by Smith and the removal of the window rod from the cell, plaintiff was subjected to no further physical contact or restraint, save and except for procedures implemented to carry him to the infirmary for examination. The Court further finds that Pennington was prevented from making further contact with the plaintiff, though he was still upset and agitated.

The evidence fails to reflect "the unjustified striking, beating, or infliction of bodily harm upon a prisoner by the police or a correctional officer...." *Grimsley v. Luttrell,* 1993 WL 53150, at *2, 1993 U.S.App. LEXIS 4525, at *6 (4th Cir.1993) (quoting *King v. Blankenship,* 636 F.2d 70, 72 (4th Cir.1980)), nor can it be inferred that the force used by Pennington was not reasonably related to a nonpunitive objective. *Highsmith v. Pulley,* 1991 WL 110360, 1991 U.S.App. LEXIS 13108 (4th Cir.1991); *United States v. Cobb,* 905 F.2d 784, 789 (4th Cir.1990), *cert. denied,* 498 U.S. 1049, 111 S.Ct. 758, 112 L.Ed.2d 778 (1991).

### B. There is no Evidence That the Plaintiff was Physically Harmed.

The testimony of the plaintiff established him as a man prepared to engage in violent and disruptive behavior, without regard to his own physical well-being.

Only a few moments after the events of April 27, 1993, Rowlette arrived at the plaintiff's cell. He inquired about what had occurred and was informed by the plaintiff that he had been injured by Pennington using the window pole. In response to plaintiff's complaint, Rowlette requisitioned additional correctional officers and promptly began moving plaintiff to the infirmary. The trip was interrupted for only the briefest interval by the presence of Pennington in the hallway outside the kitchen. Once Pennington was deflected, the plaintiff was taken directly to the

infirmary where he was promptly examined by a physician.

The medical doctor who examined plaintiff found no evidence of bruising or blunt trauma to his abdomen or chest, consistent with the use of a pole or metal object being driven against him with great force. Instead, Dr. Sarker merely found evidence of tenderness in the upper chest and responded to plaintiff's complaints of neck and back pain by giving plaintiff a mild pain reliever. According to Rowlette, plaintiff's chief complaint appeared to arise from efforts of the guards to keep him away from Pennington.

The medical records submitted in evidence as Exhibit 7 on behalf of the Commonwealth reveal that on April 26, 1993, the plaintiff was in the infirmary following his altercation with correctional officers in the recreation yard for treatment of his eyes which had been sprayed with mace. The record does not reveal whether he received any treatment or expressed any complaint about a back or neck being injured. However, on the following day, Dr. Sarker was unable to tell whether the complaints of the plaintiff, concerning his neck or his shoulder, were related to the events of April 27 or the day before.

■ In order to sustain an Eighth Amendment claim of cruel and unusual punishment, plaintiff must establish some evidence that he has been injured as a result of the conduct perpetrated by the prison official. As the Fourth Circuit stated in *Norman v. Taylor,*

> Although the Court stated that "contemporary standards of decency always are violated" when "prison officials sadistically and maliciously use force to cause harm"—*Hudson* does not hold that such a claim may be stated in the absence of *any* injury or one of *de minimis* proportions.

9 F.3d at 1082.[2]

The plaintiff has failed to sustain his burden of proving that he suffered a compensable injury as a result of the conduct of any defendant.

**2.** Although judgment was vacated, 1994 U.S.App. LEXIS 412 (1994), counsel for the defense correctly notes that both the panel majority and the

## C. Plaintiff Has Failed to State a Claim Cognizable Under the Eighth Amendment to the United States Constitution.

An excellent summary of the law governing Eighth Amendment claims was set forth by the Fourth Circuit Court of Appeals in *Highsmith v. Pulley,* a 1991 unpublished decision:

> Inmates are protected from the use of excessive force against them by the cruel and unusual punishment clause of the eighth amendment. *Graham v. Connor,* 490 U.S. 386 [109 S.Ct. 1865, 104 L.Ed.2d 443] (1989). As noted by the Supreme Court, "it is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause...." *Whitley v. Albers,* 475 U.S. 312, 319 [106 S.Ct. 1078, 1084, 89 L.Ed.2d 251] (1986); see also *Miller v. Leathers,* 913 F.2d 1085 (4th Cir.1990) (*en banc*) (must show infliction of unnecessary and wanton pain and suffering), *cert. denied,* [498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100] 59 U.S.L.W. 3564 (U.S.1991). The question is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley,* 475 U.S. at 320–21 [106 S.Ct. at 1085] (citing *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033 [94 S.Ct. 462, 38 L.Ed.2d 324] (1973)). Punitive intent may be inferred when the force used was not reasonably related to a legitimate non-punitive objective. *United States v. Cobb,* 905 F.2d 784, 789 (4th Cir.1990), *cert. denied,* [498 U.S. 1049, 111 S.Ct. 758, 112 L.Ed.2d 778] 59 U.S.L.W. 3482 (U.S.1991). The court should also consider such factors as the need for the application of force, the relationship between need and amount of force used, and extent of injury inflicted. *Miller,* 913 F.2d at 1087 (quoting *Whitley,* 475 U.S. at 321 [106 S.Ct. at 1085]); see also *Pressly v. Gregory,* 831 F.2d 514, 517 (4th Cir.1987); *King v. Blankenship,* 636 F.2d 70, 73 (4th Cir.1980).

dissent agreed that a *de minimis* injury standard still exists in light of the Supreme Court's opinion in *Hudson.*

1991 WL 110360, at *1, 1991 U.S.App. LEXIS at 1–2.

*Highsmith* both preceded and anticipated the holding in *Hudson v. McMillian.* Of significance in both the *Highsmith* and the *Hudson* decisions is conduct on the part of prison officials which appears to be deliberate and committed with the intent to cause harm, and nothing more. There is no evidence to support such conduct in the case now before the Court.

Instead, the plaintiff, advancing the claim of excessive force, concedes that he assaulted a corrections officer by throwing human waste on him. As Pennington noted in his testimony, what made the event even more degrading was that plaintiff obtained the excrement of another prisoner to use against defendant.

Prisons are not always the most congenial of places. In *Miller v. Leathers,* 913 F.2d 1085 (4th Cir.1990), Judge Wilkinson wrote a powerful dissent in which he quoted Judge Friendly: "The management by a few guards of large numbers of prisoners, not usually the most gentle or tractable of men and women, may require and justify the occasional use of a degree of intentional force." *Id.* at 1090. He went on to say that "While endurance of a certain amount of verbal jousting is part of the profile of professionalism of any prison guard, the people behind the uniforms are still human beings. Prisons, moreover, are combustible settings, and prison order rests upon a fragile equilibrium." *Id.*

■ Plaintiff was not subjected to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution because the conduct of Pennington did not constitute any part of the punishment imposed by the Virginia Department of Corrections; it involved a response by a corrections officer who had just been covered in filth as a result of an unwarranted assault by a prison inmate. Whether his use of the window rod through the bars of the cell was appropriate or not, Pennington left no doubt that he did not intend to tolerate another cup of waste thrown at him. The incident was brought to a prompt and professional conclusion by the intervention of a second correc-

tions officer who convinced Pennington to leave the area and attend to himself. As the Supreme Court in *Hudson* stated:

> [T]he unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment.
>
> . . . .
>
> Many of the concerns underlying our holding in *Whitley* arise whenever guards use force to keep order.... [W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley:* whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.

503 U.S. at ——, 112 S.Ct. at 998–99, 117 L.Ed.2d at 165–66 (citations omitted).

Plaintiff fails to satisfy both components: objectively, he suffered *no* harm; subjectively, the officer acted to defend himself and not with a "culpable state of mind."

Plaintiff is not entitled to judgment against Pennington.

### D. There is no evidence of use of excessive force, or the condoning thereof, by Lt. Rowlette.

■ The record is devoid of any facts, or evidence, which support an Eighth Amendment claim against Rowlette. To the contrary, the record establishes that Rowlette visited the plaintiff immediately after the incident of April 27, 1993; promptly presented plaintiff to a physician for treatment; protected plaintiff from further harm; and moved to discipline the offending corrections officer.

Rowlette is entitled to summary judgment.

### III. RECOMMENDATION

For all of the foregoing reasons, the Court recommends that plaintiff's motion for summary judgment be DENIED, and the defendants' motion for summary judgment be GRANTED.

## IV. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within 10 days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three days permitted by Rule 6(e) of said rules.

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Carr v. Hutto,* 737 F.2d 433 (4th Cir.1984), *cert. denied,* 474 U.S. 1019, 106 S.Ct. 567, 88 L.Ed.2d 552 (1985); *United States v. Schronce,* 727 F.2d 91 (4th Cir.), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).

Newport News, Virginia

June 22, 1994.